JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
KEVIN B. CLUNE (248681)
clune@kerrwagstaffe.com
KENNETH P. NABITY (287927)
nabity@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, CA 94105–1727
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Plaintiffs
DENISE HUSKINS and AARON QUINN

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE HUSKINS and AARON QUINN,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF VALLEJO, a public entity, KENNY PARK, MATHEW MUSTARD, and DOES 1-25,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1.  VIOLATION OF THE FOURTEENTH AMENDMENT – STIGMA PLUS UNDER 42 U.S.C. § 1983 AND *PAUL V. DAVIS*;<br>2.  DEFAMATION UNDER CAL. CIVIL CODE §§ 43, ET SEQ.;<br>3.  VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS – UNREASONABLE SEIZURE UNDER 42 U.S.C. § 1983;<br>4.  FALSE ARREST AND FALSE IMPRISONMENT;<br>5.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;<br>6.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.<br><br>**JURY TRIAL DEMANDED** |

KERR
—&—
WAGSTAFFE
LLP

Plaintiff Denise Huskins and Aaron Quinn (collectively "Plaintiffs") hereby allege as follows:

## INTRODUCTION

1.  Defendant City of Vallejo and members of its police department Kenny Park, Matthew Mustard, and Does 1-25 (collectively "Defendants") waged a vicious and shocking attack on two victims of a terrifying home invasion, kidnapping, and rape.  As part of its continuous pattern of malicious and unlawful conduct, Defendants violated Denise Huskins and Aaron Quinn's constitutional rights and unfairly destroyed their reputations through an outrageous and wholly unfounded campaign of disparagement.  Instead of focusing on finding the true perpetrator (who has since been identified in court filings) and protecting the community from a violent predator, Defendants attacked Plaintiffs and Plaintiffs' families, created a destructive nationwide media frenzy through public statements accusing Plaintiffs of faking Denise's kidnapping and rape, and rubbed salt in Plaintiffs' fresh wounds in the days and weeks following the attacks.  Denise and Aaron deserve justice for Defendants' inexcusable conduct.

## PARTIES

2.  Denise Huskins ("Huskins") is a licensed physical therapist who had been living in Vallejo, California at the time of the events discussed herein.  Huskins has a Doctorate in Physical Therapy, and at the time of the events was a resident in an international, post-graduate residency program for adult neurological rehabilitation.  Huskins had been in line for a prestigious orthopedic fellowship at Kaiser until her life was derailed by Defendants' treatment of her.

3.  Aaron Quinn ("Quinn") is a licensed physical therapist who had been living in Vallejo, California at the time of the events discussed herein.  Quinn has a Doctorate in Physical Therapy, and had been working at Kaiser's neurological rehabilitation center.  Quinn has been in a relationship with Huskins since before the kidnapping occurred.

4.  Defendant City of Vallejo is a public entity and the largest city in Solano County, California.  The City of Vallejo contains the Vallejo Police Department ("VPD"), which is not a separate legal entity from the City of Vallejo.  VPD's website states that it is "a premier law

K E R R
&
W A G S T A F F E
LLP

1  enforcement agency that is second to none."  VPD's mission is "[t]o provide professional law

2  enforcement services that enhance, protect, and promote the quality of life for persons residing,

3  visiting, or doing business in the City of Vallejo."  VPD's core values include "professionalism,"

4  whereby VPD states it "will conduct itself consistent with our professional and ethical standards

5  of leadership, communication and responsibility. . . . We . . . will be accountable for ourselves

6  and our actions and will at all times treat others with honor, respect and compassion."

7       5.     Defendant Detective Mathew Mustard ("Det. Mustard") is and was, at all relevant

8  times, a Detective with VPD.  On information and belief, Det. Mustard is a resident of the City

9  of Vallejo, and is currently the President of the Vallejo Police Officers' Association.

10       6.     Defendant Lieutenant Kenny Park ("Lt. Park") is and was, at all relevant times, a

11  Lieutenant with VPD.  On information and belief, Lt. Park is a resident of the City of Vallejo.

12       7.     Plaintiffs are currently unaware of the true identities of the other Defendants,

13  particularly the individual officers at VPD who were involved in the allegations described below.

14  Plaintiffs reserve the right to add additional names as new information is learned.

15       8.     The true names and capacities of defendants Does 1-25, inclusive, are unknown to

16  Plaintiffs.  Plaintiffs therefore sue said defendants by such fictitious names.  Plaintiff further

17  alleges that each of said fictitious defendants is in some manner responsible for the acts and

18  occurrences herein set forth.  Plaintiff will amend this Complaint to show these defendants' true

19  names and capacities when they are ascertained, as well as the specific manner in which each

20  fictitious defendant is responsible.

21       9.     Plaintiff is informed and believes, and on that basis alleges, that at all times

22  mentioned in this Complaint, each defendant was an agent, manager, director, officer, servant,

23  employee, co-conspirator and/or joint venturer of each remaining defendant, and was at all times

24  acting within the course and scope of that agency, management, direction, office, servant,

25  employment, co-conspiracy and/or joint venture.

26               **JURISDICTION AND VENUE**

27       10.     This Court has federal subject matter jurisdiction over claims for deprivation of

28  constitutional and federal statutory rights in violation of 42 U.S.C. § 1983 pursuant to 28 U.S.C.

KERR
&
WAGSTAFFE
LLP

1   §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiffs' remaining claims

2   pursuant to 28 U.S.C. § 1367.

3       11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a

4   substantial part of the events or omissions giving rise to this claim occurred in this District.  On

5   information and belief, all Defendants are residents of California and reside in this District.

6   ## GENERAL ALLEGATIONS

7   ### Huskins And Quinn Are Violently Assaulted In Their Sleep, Terrorized And
8   ### Interrogated, And Huskins Is Kidnapped

9       12.     During the early hours of March 23, 2015, Plaintiffs were peacefully sleeping in

10  Quinn's home in Vallejo when an intruder broke in and proceeded to assault and terrorize them.[1]

11  The intruder blindfolded Plaintiffs, bound their hands and feet, put headphones around their ears,

12  drugged them, and separated them into different rooms.

13      13.     The intruder then asked Quinn (who was under the effects of the heavy sedatives

14  the intruder gave him) numerous questions about his financial accounts, email and account

15  passwords, and personal history.  Quinn was informed that the intruder was asking similar

16  questions of Huskins and that he would harm Huskins and Quinn if they lied to him regarding

17  this information.  Quinn did the best that he could to provide such information under extremely

18  terrifying circumstances and eventually the assailant determined that he had all of the

19  information he needed.

20      14.     Quinn was then informed that Huskins would be kidnapped for $15,000 ransom.

21  The kidnapper placed Quinn on the couch and ordered him to not move from that spot, where he

22  was required to stay within a designated area marked off by tape and where he would be watched

23  by surveillance cameras the intruder left behind.  The intruder would communicate with Quinn

24  by cell phone, which he was told to monitor with the line open, and through Quinn's own email

25

26  [1]     The intruder was subsequently identified by authorities as Matthew Muller.  Although
27  Mr. Muller has since indicated that he was acting alone, Plaintiffs thought at that the time (due to
    the manner in which they were blindfolded and bound) that there were multiple people involved.
28  For ease of reference, this complaint simply references the "intruder" or "kidnapper" (singular)
    even though more individuals may still have been involved.



KERR
&
WAGSTAFFE
LLP

account.  Quinn was specifically told that he was being watched on camera and that if he did not follow the intruder's instructions the intruder would harm Huskins.  The kidnapper also threatened to hurt Quinn's family if he went to the police.  Quinn was further instructed that the intruder would be taking Quinn's car and laptop.  The kidnapper then took Huskins and left the residence.

15.     Quinn, confined to the couch, ultimately succumbed to sleep from effects of the strong sedative the intruder had given him.  When he awoke hours later he was terrified and agonized for the next several hours about what to do.  He was afraid to leave the house or call the police for fear that the kidnapper would harm Huskins.  In the intervening hours, he received a number of texts and emails requesting a ransom for Huskins's release—now up to two separate payments of $8,500 for a total of $17,000.

16.     Ultimately, Quinn was left with an impossible choice: go to the police and risk the kidnapper harming Huskins as a result, or not obtain the help of professional law enforcement to secure her release, and risk that such inaction could cause Huskins more harm.  Thinking—incorrectly, as it turned out—that the best way to protect Huskins would be to secure the help of law enforcement officers who could help track down their assailant, Quinn called the Vallejo Police Department.

**Defendants Aggressively Interrogate Quinn For Nearly 18 Hours**

17.     Quinn called VPD at approximately 1:50 p.m. on March 23, 2015.  VPD came to his home.  Before Quinn could tell them what had happened the night before, VPD broke through the tape line the kidnapper created and unplugged the camera the kidnapper set up.  Quinn showed VPD the numerous items left by the intruder, including a battery pack and the camera, but VPD nonsensically focused on whether Quinn had recently held a party.  Had the police even performed a routine investigation, they would have also discovered corroborating evidence, including where the intruder slit window screens and drilled holes into the windows to unlatch the locks in order to enter the home forcibly.

18.     Quinn then went with officers to the VPD station at 3:30 p.m., where he was promptly and maliciously treated like he had already been convicted of murdering Huskins.

19.     VPD took Quinn's clothing.  In exchange, Quinn was given prison pants with the words "Solano Prison" displayed on the side and a dirty white t-shirt, but no underwear or socks. They also took his blood and DNA but did not share the results of these tests with him.  The police placed Quinn in an interrogation room, where he was cut off from any family or other visitors who would be able to help him.  The room was accessible only to those who passed through doors with keypad locks, and individuals who entered the room were required to offload their personal effects.

20.     Rather than even entertain that Quinn was telling the truth and that Huskins—and the public—were at extreme danger from a violent predator, VPD immediately and recklessly assumed, based on nothing but fanciful speculation, that Huskins was already dead and that Quinn had killed her.  Thus, they proceeded to interrogate Quinn aggressively for 18 straight hours, while Huskins was still in the hands of a violent kidnapper and being subjected to even more grievous harm.

21.     Det. Mustard and others aggressively interrogated Quinn, and repeatedly told Quinn they believed he was lying, that they did not want to hear anything else about any claimed intruders, and that they knew that Quinn had really killed Huskins.  VPD told Quinn he would be branded a "cold, calculated monster," asked him whether he had ever seen a body after it had been exposed to the elements, and told him he was going to ruin his family's name.

22.     VPD (including but not limited to Det. Mustard) led Quinn to believe that he was not free to leave.  For example, a sign on the inside of the door read "This door is to remain closed at all times."  During the interrogation, they locked the door from the outside and had to unlock the door to enter.  They intentionally confined him in a small space without a clock, positioned themselves between Quinn and the doorway—physically blocking his ability to leave—and screamed at Quinn and invaded his personal space.

23.     When Quinn had to use the bathroom, officers accompanied him and never left him alone.  During his entire time at the police station, Quinn was given only two bottles of water, a travel-size bag of chips, and a slice of cold pizza during the interminable interrogation.

1    At breaks, Quinn was left in the room alone, where he curled up in the rolling swivel chairs and

2    cried.

3         24.    They also kept Quinn incommunicado from his relatives, despite requests from

4    both Quinn and his relatives that they be allowed to see each other.  For nearly the entire

5    interrogation, Quinn's father, mother, and brother waited at the VPD station.  Quinn requested to

6    speak with his brother multiple times.  VPD falsely told Quinn that no one was there for him, in

7    an apparent effort to coerce him to confess to a crime he did not commit.

8         25.    Even more outrageously, because VPD was so intent upon going after Quinn,

9    rather than attempting to find the true perpetrators of these crimes, VPD missed (or intentionally

10   ignored) key evidence that would have both corroborated Quinn's account and could have kept

11   Huskins from further harm.  Quinn had told the officers that the kidnapper would be

12   communicating with him via his email account and cell phone.  VPD prevented Quinn from

13   being able to monitor the phone himself by detaining him apart from the phone during the

14   interrogation.  Once taken from Quinn, the officers never so much as monitored the phone or

15   Quinn's email accounts.  As Quinn told the officers would occur, the kidnapper reached out both

16   by email and phone.  At 7:46 p.m. and 8:13 p.m., while Quinn was being detained, the kidnapper

17   sent emails stating that he would call Quinn on his mobile device "at about 9pm."  The kidnapper

18   followed through with phone calls, placing at least two calls and likely a third call as well that

19   never registered because the police had taken the incredible step of putting Quinn's phone on

20   airplane mode.  Because the officers failed to monitor these lines of communication, they missed

21   an opportunity to trace the phone to its South Lake Tahoe location (as they were easily able to do

22   when their egregious mistake was realized approximately 24 hours later).  And while the officers

23   were dithering, Huskins was still in the hands of the kidnapper enduring the ultimate nightmare.

24        26.    Over twelve hours after Quinn's interrogation began—and approximately 24

25   hours after he had first been drugged and assaulted by the kidnapper—the investigating officers

26   subjected Quinn to a lie detector test at approximately 3:00 a.m.  Upon information and belief,

27   there was no indication that Quinn lied in response to any question.  Nonetheless, Quinn was told

28   that he had failed the test, and VPD continued to interrogate him even more aggressively.

27.   At breaks during Quinn's interrogation, the officers falsely implied to Quinn's family that their son and brother had killed Huskins.

28.   Quinn demanded to speak to an attorney.  Even then, the police continued to violate Quinn's Constitutional and other rights by keeping him isolated from his attorneys for several more hours.

29.   At one specific break, Det. Mustard even asked Quinn's brother, who is a special agent with the FBI and an attorney, to help get a confession from Quinn.  Det. Mustard lied to Quinn's brother, telling him that there was no camera at Quinn's home, and stated that Quinn was having a schizophrenic breakdown.  Det. Mustard emphasized that Quinn was guilty and that they could still charge Quinn for murder without Huskins's body, but that he only wanted to locate Huskins's body for her family.

30.   At 6:00 a.m., VPD finally allowed Quinn to speak with his brother.  Quinn's brother recognized Quinn was not free to leave, and assisted Quinn in finding an attorney by 9:00 a.m.

31.   Despite the aggressive posturing, VPD did not have any evidence to charge Quinn with any crime, and he was released after his attorney arrived.  VPD delayed Quinn's departure in an attempt to secure more media coverage of Quinn's release.  When VPD finally allowed Quinn to leave, they tried to force Quinn—sleep deprived, hungry, and still wearing the jail clothes from VPD—to exit the front of the station where numerous media outlets had congregated at VPD's instruction.  Quinn's attorneys identified what VPD was doing and secured a more discrete release.

**Huskins Is Kidnapped, Transported Across The State In The Trunk Of A Car, And Raped Twice**

32.   While VPD focused on unsubstantiated theories and ignored evidence, Huskins endured unimaginable terror and a violent assault.  When initially taken from Quinn's house, Huskins was forced into the trunk of Quinn's stolen car.  At some point, the kidnapper transferred Huskins into the trunk of a second car, where she eventually lost consciousness from the heavy sedative.

KERR
&
WAGSTAFFE
LLP

33.     After the long drive ended, Huskins was dragged into the bedroom of a quiet home and tied to the bed with zip ties and a bike lock.  For the next day, Huskins remained a hostage in this small room, and was forced to wear a blindfold made of blacked out swim goggles when her captor entered the room.

34.     During the first day, the kidnapper told Huskins he would rape her.  Even more horrifying, Huskins was told the kidnapper would be filming the encounter, which would be used against her if she ever went to the police.  The kidnapper followed through with his threat while she was still blindfolded, all while she understood a camera captured the repulsive act.  During these times, Huskins felt as though she was going to be killed.

35.     Once finished, Huskins was left alone in the small room.  The kidnapper returned to the room a few times to provide water and food.  Huskins was drugged again and again while held captive.

36.     The following day, the kidnapper told Huskins that his "boss" demanded that he rape her a second time in order to secure a better recording.  Again, Huskins was raped while the kidnapper purportedly filmed it.  And again, Huskins remained alone in an unknown room after the kidnapper left.

37.     Following the second rape, the kidnapper told Huskins that she would be released. Huskins was convinced that she would be killed before the kidnapper would ever release her. The kidnapper threatened Huskins again, telling her that when she spoke with the police or media she should never speak of the rape or the fact that the kidnapper mentioned he was ex-military.  Huskins was terrified of what this person, much less the organization he claimed to be part of, would do if she did not comply.

38.     Huskins was again drugged and blindfolded, as the kidnapper drove for hours.

**Following A "Proof Of Life" Tape, VPD Makes Vulgar Accusations**

39.     While held captive, the kidnapper forced Huskins to record a "proof of life" tape, used by kidnappers asking for ransom to prove that the kidnapped person is still alive.  That recording was transmitted to Henry Lee of the San Francisco Chronicle on the afternoon of

Tuesday, March 24, who shared it with VPD.  Shortly thereafter, VPD had Huskins's mother and brother verify that her voice was the voice in the recording.  They confirmed that it was.

40.     During that encounter, VPD officers asked Huskins's mother if Huskins had ever been kidnapped or assaulted before.  Huskins's mother confided that Huskins had been sexually molested when she was 12 years old.  In yet another shocking attempt to blame the victim, an officer (who, on information and belief, was Detective Mustard) stated that the fact Huskins had previously been sexually abused made sense because, in his experience, women who have already been sexually assaulted often pretend that it is happening again in order to gain attention and re-live the excitement of that experience.  He explained that this "fact," along with the evidence that Huskins was still alive, made it likely that Huskins was just making this whole incident up to get attention.

41.     Later that evening, and while Huskins's whereabouts were still unclear, an unknown officer walked Huskins's mother and brother out of the VPD station.  The officer remarked that in five years—presumably after any statute of limitations had run on any legal claims—he would love to tell them what happened.  Huskins's mother and brother interpreted this statement as recognition that something corrupt was going on behind the scenes.  The officer refused to expand on his statement.

**Huskins Is Released In Huntington Beach, And VPD Accuses Her Of A Crime Before Taking Her Statement**

42.     Huskins was released near her parents' homes in Huntington Beach around 10:00 a.m. on March 25, 2015.  Huskins located a neighbor, who called her father and the police.  The Huntington Beach Police Department ("HBPD") responded within minutes.

43.     When they first arrived, HBPD observed "'darker impression circles' around her eyes, consistent with wearing swim goggles."  Huskins also showed HBPD the shoes—which were too large for her feet—and water bottle the kidnapper had given her.  Still tired, terrified, and traumatized, Huskins spoke with HBPD for approximately one hour about the events leading to her release.

KERR
&
WAGSTAFFE
LLP

1    44.    With respect to the home invasion, Huskins's account entirely corroborated

2    Quinn's.

3    45.    Huskins also relayed all of the information concerning her captivity to the police.

4    Huskins told HBPD "that she was scared of what could happen to her if she spoke with police

5    and what information she provided would become public."  Huskins was even more afraid

6    because the kidnapper knew where her parents lived.  Still in shock from the kidnapping and

7    fearful of retribution from a dangerous criminal still on the run, Huskins denied to HBPD that

8    she had twice been sexually assaulted and did not mention that the kidnapper claimed to be ex-

9    military.

10    46.    HBPD contacted VPD, and spoke with them for approximately one-half hour.  An

11    HBPD officer returned and attempted to arrange for a jet to take Huskins to Vallejo from John

12    Wayne Airport.  On information and belief, VPD representatives made false and damaging

13    statements to HBPD about Quinn and Huskins.

14    47.    On information and belief, VPD gratuitously made numerous additional false and

15    otherwise defamatory statements about Huskins and Quinn to others without any valid law

16    enforcement purpose.

17    48.    Around that same time, Huskins's cousin, who is a lawyer, and aunt arrived at the

18    scene.  Following over two days of captivity, Huskins told her cousin she just wanted to be

19    somewhere safe with family, away from the chaos of the police and media, who had swarmed the

20    area where she was released.

21    49.    At some point after the initial contact with Huskins, VPD released a written press

22    release confirming that Huskins was located and that VPD planned to "meet with Ms. Huskins to

23    further piece together the details of the kidnap for ransom."  The release continued, "From an

24    investigative standpoint, **nothing has changed**."[2]

25

26

27

28    [2]    Press Release: "City of Vallejo Kidnap for Ransom – 4th update," March 25, 2015.

KERR
&
WAGSTAFFE
LLP

50.     Meanwhile, Det. Mustard was on the phone with HBPD and asked to speak with Huskins. Huskins's cousin took the call. By this point, VPD had not seen or spoken with Huskins, and had heard only portions of her account second-hand through an HBPD officer.

51.     VPD's first contact with Huskins—through Det. Mustard's call with Huskins's cousin—was not to ask about Huskins's condition or follow up on her story to help catch the dangerous predator that had just released her. Instead, Det. Mustard immediately threatened and verbally attacked Huskins. Det. Mustard told Huskins's cousin that VPD was offering a "proffer of agreement" for immunity. Det. Mustard stated that Quinn had been at the station cooperating with VPD, and whoever accepted first would get immunity. Although he had no new evidence other than the fact that Huskins was alive, Det. Mustard instantaneously and tactically discounted his "Quinn murdered Huskins" theory and entertained a salacious and absurd "Gone Girl" [3] theory. Given that Huskins had "inconveniently" shown up alive, VPD maliciously transitioned to the hoax story to avoid criticism for its initial and utterly false accusations of murder. Det. Mustard told Huskins's cousin, "I don't want to hear any more about this Navy Seal bullshit," or words to that effect.

52.     Back at the VPD station, Huskins's family, including her mother, father, brother, cousins, and aunt, waited with bated breath during Huskins's release from her kidnapping for any information about her condition. Rather than comfort a distraught family, Det. Mustard told Huskins's family members the same thing he told her cousin over the phone: that they did not believe Huskins's story and that VPD may investigate her for criminal activity. Additionally, Det. Mustard believed Quinn was involved, and Huskins would be offered immunity to help put Quinn away. Det. Mustard had grown increasingly angry that day, repeatedly stating he did not

---

[3]     "Gone Girl" is a fictitious book-turned-to-film about a cheating husband accused of killing his wife. A final twist reveals that, rather than being kidnapped, the wife elaborately faked her disappearance to frame the husband as revenge for his infidelity. As the wife eludes the authorities, she seeks help from a former lover, who takes her into his home. The wife tricks the former lover into having sex with her, during which she slits his throat with a box-cutter. The wife then uses a wine bottle to mimic the injuries suffered during rape, returns to her home covered in blood, and blames the former lover for kidnapping and raping her. The wife's hoax succeeds.

KERR
&
WAGSTAFFE
LLP

1  want to hear any more about the supposed kidnappers, referring to them derisively as "frog

2  men." Huskins's family at the VPD station relayed this hostile behavior to her in Huntington

3  Beach.

4      53.    At 3:30 p.m., Lt. Park held a press conference following up on the written press

5  release. Lt. Park stated that Huskins had been located. Lt. Park acknowledged that he was

6  unaware of Huskins's medical condition and refused to answer numerous questions concerning

7  details of the investigation.

8      54.    Det. Mustard also interviewed Quinn again. During this interview, although Det.

9  Mustard acknowledged that VPD still had a lot of questions and very few answers, he told Quinn

10  that he did not believe there was a kidnapping. Quinn's attorney asked VPD for a single

11  question they thought Quinn could answer that he had not already—they provided none. Still,

12  Det. Mustard stated that he did not want to waste resources and wanted to "put this thing to bed."

13      55.    Before ever seeing or speaking with Huskins, and without a shred of evidence in

14  support of their preconceived conclusion, VPD treated the victim of a kidnapping and sexual

15  assault like the criminal they refused to pursue. Fearful that VPD would unjustifiably arrest her

16  and return her to a small locked room by herself, Huskins hired a criminal attorney and arranged

17  for her own transportation back to the Bay Area. Huskins travelled alone with a borrowed cell

18  phone, cowering wherever she could to avoid the press, police, or kidnapper, each which she

19  reasonably believed were still after her.

20      56.    She arrived in San Francisco at approximately 9:30 p.m. on March 25, 2015.

21  When she had landed, VPD had changed her life for the worse.

22      **VPD Publicly Smears Huskins And Quinn**

23      57.    VPD's frustration with its own inadequate investigation boiled over into a series

24  of retaliatory actions targeted at Huskins and Quinn that destroyed their reputations and have

25  forced them to move away from the community. To date, VPD has not provided any basis for

26  any of its public statements, nor has it provided any evidence to justify its disastrous conclusions.

27  This campaign of character assassination was neither required nor part of any professional police

28  activity.

58.     VPD's dramatic public relations assault began while Huskins was attempting to return to Vallejo on the evening of March 25, 2015.  First, VPD issued a press release, stating in part:

> **Today, there is no evidence to support the claims that this was a stranger abduction or an abduction at all. Given the facts that have been presented thus far, this event appears to be an orchestrated event and not a kidnapping.**

59.     This release was neither required nor accurate, and it was not made during the exercise of any policy-making functions by VPD (but instead as part of VPD's ministerial and/or operational duties).

60.     At a press conference held that same evening at approximately 9:27 p.m., Lt. Park made the following statements:

- o   "And from this point forward, I will not refer to them as a victim or a witness."

- o   "We also know that the statement that Mr. Quinn provided was such an incredible story, we initially had a hard time believing it, and, upon further investigation, we were not able to substantiate any of the things that he was saying."

- o   "So over the course of the last few days, if I can kind of put things in perspective, we have had over 40 police detectives from the local, state and federal levels, and over 100 support personnel assisting in the investigation, working around the clock, to help locate Ms. Huskins.  That is a tremendous amount of resources that, in my opinion, was wasted.  **I can sit here and apologize for me – for all of us – being guarded with our information, but I can tell you in the grand scheme of things, Mr. Quinn and Ms. Huskins has plundered valuable resources away from our community, and has taken the focus away from the true victims of our community, while instilling fear amongst our community members.  So, if anything, it is Mr. Quinn and Ms. Huskins that owes this community an apology."**

- o   Question: "Can you say again, Lieutenant, what this has done to the community of Vallejo, just getting out of bankruptcy, and a very small police department?"

  Lt. Park: "If you can imagine devoting all of our resources, 24 hours a day, **on what I will – uh - classify as a wild goose chase** – it's a tremendous loss.  It's disappointing, it's disheartening, and **the fact that we've essentially wasted all of these resources, for essentially nothing, is upsetting.**"

o   Question: "Is there any evidence that makes you know, conclusively, that this was a fake? I mean, did something come up that made it without argument that this was all a hoax?"

Lt. Park: "**I can tell you that our investigation has concluded that none of the claims has been substantiated. I can go one step further to say this – that this was not a random act, and that the members of our community are safe, and that they have nothing to fear.**"

61.     Each statement was undeniably false and despicable—VPD, a professional law enforcement organization, formally accused two victims of a horrific home invasion and kidnapping of falsifying the entire incident. Lt. Park and VPD knew that it is a crime to provide false statements to the police, and indicated that Huskins and Quinn had committed that crime. Lt. Park's public statements were delivered with malice and careless disregard for the truth. Lt. Park preemptively announced that Huskins and Quinn caused a "wild goose chase" and "owe[] this community an apology," but refused to go into any details about what led to such a conclusion.

62.     But what is worse, although Lt. Park stated he could not go into the details in order to preserve the investigation, VPD and Lt. Park had no evidence to support the false and disparaging comments made so publicly during an open investigation. That VPD could not substantiate Huskins or Quinn's story was not Huskins or Quinn's fault, nor the nature of what had occurred, but was instead a product of VPD's own carelessness, recklessness, and/or intentional misconduct during the investigation. Where VPD could have impartially evaluated the evidence presented, VPD took its cues from Hollywood.

63.     More still, VPD had effectively ended other investigations that could have more quickly identified and apprehended the kidnapper. VPD's statement extinguished any stream of leads that would connect the kidnapper to prior cases, particularly given the unique facts.

64.     Within minutes of VPD's false statements that Huskins's kidnapping was a hoax, VPD had successfully and widely spread its "Gone Girl" theory, turning a local disappearance into a worldwide media frenzy proliferating VPD's public smearing of Huskins and Quinn. News outlets across the world likened Huskins to the lead character in the film "Gone Girl," and placed Huskins's picture next to that of the lead character, including one depicting the character

1   naked and covered in blood.[4]  Nancy Grace took to television displaying the Twitter hashtag

2   "#kidnappinghoax."[5]

3       65.    This is the world Huskins returned to—that VPD created—after over two days of

4   sexual assault, being locked to a bed blindfolded, and being transported in the trunk of a car all

5   over California.

6       66.    VPD's conduct was so outrageous that it inspired *even the person responsible for*

7   *kidnapping and raping Huskins* to come to her defense.  In three long, anonymous emails written

8   to Henry Lee of the San Francisco Chronicle within five days of Huskins's release, Huskins's

9   kidnapper provided a "full account" of what happened in order to alleviate the public perception

10   that Huskins and Quinn, indisputable victims, were somehow criminals.  The emails provided the

11   same description of events that Huskins and Quinn had provided to the authorities, as well as

12   additional details about the background and purpose of the kidnapping.

13         **VPD Continues To Attack Huskins And Quinn**

14       67.    Shortly after Huskins landed in San Francisco, Huskins's attorney told VPD that

15   she would cooperate.  Huskins's attorney also told VPD that Huskins wished to submit to a

16   sexual assault exam as soon as possible.  VPD demeaned the exam request, responded that the

17   sexual assault exam could wait, and told her attorney that Huskins should "keep her clothes on."

18   A law enforcement official on the case told Huskins's attorney to watch "Gone Girl" to

19   understand their investigation.  VPD both publicly and privately implied that Huskins had lied

20   about being sexually assaulted, patronizingly and misogynistically implying that she could not

21   have been raped unless she had grievous physical injuries.

22       68.    On information and belief, VPD never tested Huskins's SART test.

23

24

---

25   [4]    Jimmy McCloskey, *Woman who faked her own kidnapping is dubbed the real 'gone girl'*,

26   Daily Star, March 27, 2015, http://www.dailystar.co.uk/news/latest-news/433043/Gone-girl-kidnapping-faked-woman (last visited Sept. 16, 2015).

27   [5]    Matthew Zarrell, *Kidnap hoax: Is she the real-life 'Gone Girl'?*, HLN, Nancy Grace,

28   March 26, 2015, http://www.hlntv.com/video/2015/03/26/kidnap-hoax-denise-huskins-gone-girl-real-life (last visited Sept. 16, 2015).



69.     Huskins ultimately spoke with VPD for nearly two full days about her captivity and sexual assaults.  Nothing Huskins said provided any additional justification to the public statements Lt. Park made about her on behalf of VPD, yet VPD focused intently on proving up its "Gone Girl' case.  Investigators repeatedly told Huskins and her attorneys that she was lying, and built up a deceptive evidentiary record in hopes that they could charge her with a crime.

70.     To that end, VPD harassed Huskins's ex-boyfriend for information to see whether he thought Huskins was mentally ill.  Her ex-boyfriend did not agree with any of VPD's characterizations.  When VPD continued to ask only questions to elicit information that would further smear Huskins, her ex-boyfriend grew upset with VPD's intransigence and refused to malign Huskins's character unjustly.  VPD ultimately determined that he would not be of help to them and left, but not before making wholly gratuitous statements about the case to his neighbors in a further apparent attempt to harm Huskins's reputation and the reputations of those with whom she had associated.

71.     Due to the ongoing and aggressive harassment of Huskins and Quinn, and those connected to them, by VPD, Huskins and Quinn no longer feel safe in the City of Vallejo.  VPD's actions have forced Huskins and Quinn to leave the City of Vallejo.

### The FBI Arrests Matthew Muller For The Home Invasion And Kidnapping

72.     According to court filings, on June 5, 2015 at approximately 3:24 a.m., Huskins's kidnapper struck again in Dublin, California.  Again, he entered a home through a window screen while the homeowners slept, and woke the homeowners with a flashlight while standing at the edge of their bed.  A struggle ensued, and the male homeowner was struck in the head with a hard metal object, resulting in a large gash.  The fight continued for approximately four minutes before the intruder fled.  The police arrived and found zip ties, duct tape, a glove, and a cell phone.  The Dublin Police Department contacted surrounding Bay Area police agencies to determine whether they were working on a similar home invasion.  Dublin Police Department's simple outreach revealed two other incidents involving details that were eerily similar to Huskins and Quinn's case and the Dublin case.

73.     In one incident, a man broke into a Mountain View home wearing tight fitting, all black clothing, and a black cotton ski mask.  The intruder tied up the female tenant, placed swim goggles over her eyes, and forced her to drink a Nyquil-like sedative.  Then, the woman was forced to reveal personal information and information about her computer.  During the incident, the victim heard the intruder whispering and talking to another person.  Like Huskins, the intruder told the woman he would rape her.  Ultimately, following her pleas, the intruder did not rape the woman.  The incident lasted approximately two hours before the intruder left.

74.     In the second incident, a man broke into a Palo Alto apartment at approximately 3:30 a.m.  The intruder awoke the female tenant by straddling her and told her that it was a robbery.  The intruder was wearing tight fitting, all black, spandex-type clothing, a black mask over his face, and gloves.  The woman was tied up, blindfolded, and drugged with a NyQuil-like sedative.  The intruder then demanded personal information and access information to the victim's online accounts.  During the incident, the victim heard the intruder whispering and talking to another person.  The intruder then attempted to rape the woman.  When she fought back, the intruder threatened to drug her.  The victim then told the intruder she had been raped before, and he stopped attempting to rape her.  Palo Alto police investigated the crime, and even spoke with Matthew Muller about it.

75.     Within three days, Matthew Muller was implicated in the June 5 invasion and arrested in South Lake Tahoe.  Detectives confiscated a number of items in the home that were described in the anonymous emails to Henry Lee, as well as a laptop matching the description of Quinn's missing laptop.

76.     On July 13, 2015, an unsealed FBI affidavit in support of an arrest and search warrant for Matthew Muller detailed Muller's involvement in Huskins's kidnapping.  The 50-plus page affidavit mirrored the accounts of Huskins and Quinn and expressly contradicted VPD's public statements.  The affidavit explained how careless VPD's statements were to the investigation, noting that VPD's statements "that this was not a kidnapping . . . could risk the

suppression of any evidence seized pursuant to the search warrant for which I am applying."[6]

77.     On October 1, 2015, Muller was indicted on a charge of kidnapping for what happened to Plaintiffs.

78.     VPD has never explained what dramatic failures resulted in such a nightmarish investigation and spiteful public relations campaign against Huskins and Quinn.

79.     VPD never had any evidence that the kidnapping was a hoax.  VPD's public statements were a vicious and destructive attack on Plaintiffs, destroyed their reputations, and struck them at their most vulnerable moment.  The FBI's affidavit[7] proved nearly every statement from VPD's press release and Lt. Park's press conference false, and has fully substantiated Plaintiffs' accounts of the incident.  In addition, VPD's false statements harmed public safety by incorrectly suggesting to the community that there was nothing to fear when in fact the kidnapper was still on the loose.

80.     On July 20, 2014, the City of Vallejo privately offered a self-serving and halfhearted apology to Huskins and Quinn via letter.  VPD acknowledged that the comments they made "contributed to the difficulty and personal ordeal that you have experienced" and that the statements "proved to be unnecessarily harsh and offensive."  VPD added that "it is clear now that there was a kidnapping on March 23, 2015, that it was not a hoax or orchestrated event and that VPD conclusions were incorrect."  VPD refused however to publicize this apology, opting rather to protect their own self-interest at the expense of the rights of these two innocent victims.

81.     To date, Defendants have failed to issue a public apology or publicly retract any prior statements about Plaintiffs.

---

[6]     Jason R. Walter Affidavit, June 29, 2015, p. 2.
[7]     A subsequent FBI affidavit filed in support of a request for search warrant to examine Muller's electronic devices adds that Muller confessed to Huskins's kidnapping to a reporter while in jail.  Affidavit of Wesley S. Drone, Aug. 14, 2015, para. 11.

KERR
&
WAGSTAFFE
LLP

**The City of Vallejo Has Rejected Plaintiffs' Government Claims**

82.     On September 17, 2015, Plaintiffs timely submitted individual claims for damages pursuant to Government Code sections 900, *et seq*. to the City of Vallejo.

83.     On January 22, 2016, the City of Vallejo gave written notice of its rejection of Plaintiffs' claims, stating that they had six months from the date of the notice to file a claim in court.

**FIRST CLAIM**
**(VIOLATION OF THE FOURTEENTH AMENDMENT – STIGMA PLUS UNDER 42 U.S.C. § 1983 AND *PAUL v. DAVIS*)**
**(Against Defendants Kenny Park and Does 1-25)**

84.     Plaintiffs hereby incorporate paragraphs 1 to 83 herein.

85.     Defendants Kenny Park and Does 1-25 made public statements concerning Huskins and Quinn in press releases and at press conferences.

86.     In addition, on information and belief, Defendants Kenny Park and Does 1-25 gratuitously made numerous false and otherwise defamatory statements about Huskins and Quinn without any valid law enforcement purpose.

87.     Each of these individual defendants were employees of the City of Vallejo, and each were acting under cover of the authority of their positions with the City of Vallejo.

88.     The public reasonably understood that each of those statements were about Huskins and Quinn.

89.     Each statement was false and defamatory, including:

- o   "Today, there is no evidence to support the claims that this was a stranger abduction or an abduction at all. Given the facts that have been presented thus far, this event appears to be an orchestrated event and not a kidnapping."  (March 25, 2015 Press Release.)

- o   Lt. Park: "We also know that the statement that Mr. Quinn provided was such an incredible story, we initially had a hard time believing it, and, upon further investigation, we were not able to substantiate any of the things that he was saying."  (March 25, 2015 Press Conference.)

- o   Lt. Park: "So over the course of the last few days, if I can kind of put things in perspective, we have had over 40 police detectives from the local, state and federal levels, and over 100 support personnel assisting in the investigation, working around the clock, to help locate Ms.

KERR
&
WAGSTAFFE
LLP

Huskins.  That is a tremendous amount of resources that, in my opinion, was wasted.  I can sit here and apologize for me – for all of us – being guarded with our information, but I can tell you in the grand scheme of things, Mr. Quinn and Ms. Huskins has plundered valuable resources away from our community, and has taken the focus away from the true victims of our community, while instilling fear amongst our community members.  So, if anything, it is Mr. Quinn and Ms. Huskins that owes this community an apology." (March 25, 2015 Press Conference.)

o   Question: "Can you say again, Lieutenant, what this has done to the community of Vallejo, just getting out of bankruptcy, and a very small police department?"

Lt. Park: "If you can imagine devoting all of our resources, 24 hours a day, on what I will – uh – classify as a wild goose chase – it's a tremendous loss.  It's disappointing, it's disheartening, and the fact that we've essentially wasted all of these resources, for essentially nothing, is upsetting." (March 25, 2015 Press Conference.)

o   Question: "Is there any evidence that makes you know, conclusively, that this was a fake?  I mean, did something come up that made it without argument that this was all a hoax?"

Lt. Park: "I can tell you that our investigation has concluded that none of the claims has been substantiated.  I can go one step further to say this – that this was not a random act, and that the members of our community are safe, and that they have nothing to fear." (March 25, 2015 Press Conference.)

90.     These defendants knew or should have known that the statements, which were defamatory as to Huskins and Quinn, were false.

91.     Each of these statements were reasonably understood to mean that Plaintiffs had committed a crime, even though these defendants possessed no evidence that Huskins and Quinn committed any crime.

92.     As a result of these defendants' actions, Huskins and Quinn have suffered severe emotional and physical distress, humiliation, and mental anguish.  Huskins and Quinn have attended counseling and therapy to address the harm Defendants' actions caused.

93.     As a result of these defendants' actions, Huskins and Quinn suffered actual damage.

KERR
&
WAGSTAFFE
LLP

20
COMPLAINT

94.     These defendants' statements were a substantial factor in causing Huskins personal and professional harm and associated deprivations of her constitutional and statutory rights.  Because of these defendants' conduct, Huskins lost out on a prestigious physical therapy fellowship and was severely hindered in her employment.

95.     These defendants' statements were a substantial factor in causing Quinn personal and professional harm and associated deprivations of his constitutional and statutory rights.  Because of these defendants' conduct, Quinn's employer began an "internal investigation" of him, causing him to miss a substantial amount of work and delaying his ability for advancement. Additionally, these defendants' conduct caused Quinn to lose potential patients, who refused to use his professional services because of the events at issue.

96.     These defendants acted with malice, oppression, and fraud.  Among other things, they knew or should have known that the statements about Huskins and Quinn were false, and made them anyway in complete indifference to Plaintiffs' rights and at a time when Plaintiffs were most vulnerable.

97.     Huskins and Quinn have a liberty interest secured by the United States and California Constitutions to their good names and reputations, which was taken from them without due process of law and in conjunction with other violations and deprivations of their constitutional rights.

## SECOND CLAIM
### (DEFAMATION UNDER CAL. CIVIL CODE §§ 43, ET SEQ.)
### (Against All Defendants)

98.     Plaintiffs hereby incorporate paragraphs 1 to 97 herein.

99.     Defendants made public statements concerning Huskins and Quinn in press releases and at press conferences.

100.    In addition, on information and belief, Defendants gratuitously made numerous false and otherwise defamatory statements of fact about Huskins and Quinn without any valid law enforcement purpose.

101.    Each of the individual Defendants were employees of the City of Vallejo, and each were acting under cover of the authority of their positions with the City of Vallejo.

KERR
&
WAGSTAFFE
LLP

102.   The public reasonably understood that each of those statements were about Huskins and Quinn.

103.   Each statement was false and defamatory, including:

- "Today, there is no evidence to support the claims that this was a stranger abduction or an abduction at all. Given the facts that have been presented thus far, this event appears to be an orchestrated event and not a kidnapping."  (March 25, 2015 Press Release.)

- Lt. Park: "We also know that the statement that Mr. Quinn provided was such an incredible story, we initially had a hard time believing it, and, upon further investigation, we were not able to substantiate any of the things that he was saying."  (March 25, 2015 Press Conference.)

- Lt. Park: "So over the course of the last few days, if I can kind of put things in perspective, we have had over 40 police detectives from the local, state and federal levels, and over 100 support personnel assisting in the investigation, working around the clock, to help locate Ms. Huskins.  That is a tremendous amount of resources that, in my opinion, was wasted.  I can sit here and apologize for me – for all of us – being guarded with our information, but I can tell you in the grand scheme of things, Mr. Quinn and Ms. Huskins has plundered valuable resources away from our community, and has taken the focus away from the true victims of our community, while instilling fear amongst our community members.  So, if anything, it is Mr. Quinn and Ms. Huskins that owes this community an apology." (March 25, 2015 Press Conference.)

- Question: "Can you say again, Lieutenant, what this has done to the community of Vallejo, just getting out of bankruptcy, and a very small police department?"

  Lt. Park: "If you can imagine devoting all of our resources, 24 hours a day, on what I will – uh – classify as a wild goose chase – it's a tremendous loss.  It's disappointing, it's disheartening, and the fact that we've essentially wasted all of these resources, for essentially nothing, is upsetting." (March 25, 2015 Press Conference.)

- Question: "Is there any evidence that makes you know, conclusively, that this was a fake?  I mean, did something come up that made it without argument that this was all a hoax?"

  Lt. Park: "I can tell you that our investigation has concluded that none of the claims has been substantiated.  I can go one step further to say this – that this was not a random act, and that the members of our community are safe, and that they have nothing to fear." (March 25, 2015 Press Conference.)

KERR
—— & ——
WAGSTAFFE
LLP

22
COMPLAINT

104.    The City of Vallejo is vicariously liable for the conduct of its employees under California Government Code § 815.2.

105.    Defendants knew or should have known that the statements, which were defamatory as to Huskins and Quinn, were false.

106.    Each of these statements were reasonably understood to mean that Plaintiffs had committed a crime, even though Defendants possessed no evidence that Huskins and Quinn committed any crime.

107.    As a result of Defendants' actions, Huskins and Quinn have suffered severe emotional and physical distress, humiliation, and mental anguish.  Huskins and Quinn have attended counseling and therapy to address the harm Defendants' actions caused.

108.    As a result of Defendants' actions, Huskins and Quinn suffered actual damage.

109.    Defendants' statements were a substantial factor in causing Huskins personal and professional harm and associated deprivations of her constitutional and statutory rights.  Because of Defendants' conduct, Huskins lost out on a prestigious physical therapy fellowship and was severely hindered in her employment.

110.    Defendants' statements were a substantial factor in causing Quinn personal and professional harm.  Because of Defendants' conduct, Quinn's employer began an "internal investigation" of him, causing him to miss a substantial amount of work and delaying his ability for advancement.  Additionally, Defendants' conduct caused Quinn to lose potential patients, who declined him professionally because of the events at issue.

111.    Defendants acted with malice, oppression, and fraud.  Among other things, they knew or should have known that the statements about Huskins and Quinn were false, and made them anyway in complete indifference to Plaintiffs' rights and at a time when Plaintiffs were most vulnerable.

### THIRD CLAIM
**(VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS –
UNREASONABLE SEIZURE UNDER 42 U.S.C. § 1983)
(Against Mathew Mustard and Does 1-25)**

112.    Plaintiffs hereby incorporate paragraphs 1 through 111 herein.

KERR
&
WAGSTAFFE
LLP

113.    Quinn hereby alleges that Defendants Mathew Mustard and Does 1-25 deprived him of his right to be free from an unreasonable seizure of his person and false imprisonment under the Fourth and Fourteenth Amendment of the United States Constitution, as well as under California law.

114.    These defendants seized Quinn's person without sufficient cause to do so while interrogating him at the VPD station under color of law.  Among other things, Det. Mustard and various VPD officer employees:

- o   forced Quinn to wear prisoner pants with the words "Solano Prison" on the side, a dirty shirt, and provided him with no underwear,

- o   locked the door to the interrogation room,

- o   stood in front of the door to the interrogation room,

- o   refused to allow Quinn access to his family members who were waiting outside, one of whom was an attorney,

- o   screamed at him and invaded his personal space,

- o   wrongfully accused Quinn of numerous crimes, including the murder of Huskins, and

- o   held Quinn for longer than was reasonably necessary.

115.    These defendants acted intentionally in seizing Quinn's person without sufficient cause to do so.

116.    The seizure of Quinn's person was unreasonable.  Specifically, these defendants had no evidence that Quinn had committed a crime.  They did not possess probable cause or even reasonable suspicion when Quinn was seized.  To date, they have not revealed a single piece of evidence linking Quinn to Huskins's disappearance at that time, or any evidence that any information Quinn provided to authorities was inaccurate or dishonest.

117.    As a result of these defendants' conduct, Quinn suffered severe emotional and physical distress, humiliation, and mental anguish.

118.    These defendants acted maliciously and oppressively, and with full knowledge that the conduct complained of was a violation of Quinn's constitutional and other rights.

KERR
&
WAGSTAFFE
LLP

**FOURTH CLAIM**
**(FALSE ARREST AND FALSE IMPRISONMENT)**
**(Against All Defendants)**

119.   Plaintiffs hereby incorporate paragraphs 1 through 118 herein.

120.   Quinn hereby alleges that Defendants deprived him of his right to be free from false arrest and imprisonment under California law.

121.   Defendants seized Quinn's person without sufficient cause to do so while interrogating him at the VPD station under color of law.  Among other things, Det. Mustard and various VPD officer employees:

- o   forced Quinn to wear prisoner pants with the words "Solano Prison" on the side, a dirty shirt, and provided him with no underwear,

- o   locked the door to the interrogation room,

- o   stood in front of the door to the interrogation room,

- o   refused to allow Quinn access to his family members who were waiting outside, one of whom was an attorney,

- o   screamed at him and invaded his personal space,

- o   wrongfully accused Quinn of numerous crimes, including the murder of Huskins, and

- o   held Quinn for longer than was reasonably necessary.

122.   Defendants acted intentionally in seizing Quinn's person without sufficient cause to do so.

123.   The seizure of Quinn's person was unreasonable.  Specifically, Defendants had no evidence that Quinn had committed a crime.  Defendants did not possess probable cause or even reasonable suspicion when Quinn was seized.  To date, Defendants have not revealed a single piece of evidence linking Quinn to Huskins's disappearance at that time, or any evidence that any information Quinn provided to authorities was inaccurate or dishonest.

124.   The City of Vallejo is vicariously liable for the conduct of its employees under California Government Code § 815.2.

KERR
&
WAGSTAFFE
LLP

25
COMPLAINT

125.    As a result of Defendants' conduct, Quinn suffered severe emotional and physical distress, humiliation, and mental anguish.  Quinn has attended counseling and therapy to address the harm Defendants caused.

126.    Defendants acted maliciously and oppressively, and with full knowledge that the conduct complained of was a violation of Quinn's constitutional and other rights.

## FIFTH CLAIM
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)
### (Against All Defendants)

127.    Plaintiffs hereby incorporate paragraphs 1 through 126 herein.

128.    Defendants' conduct was extreme, outrageous, and despicable.

129.    In so doing, Defendants abused their positions of authority as members of a public law enforcement agency, which provided them real power to affect Plaintiffs' interests.

130.    Defendants knew that Plaintiffs, as victims of a horrific home invasion, and kidnapping and sexual assault as to Huskins, were particularly vulnerable to emotional distress.

131.    Defendants knew that their conduct would likely result in Plaintiffs suffering mental and emotional distress.

132.    Defendants acted with the intent to cause Plaintiffs emotional distress, or acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress, knowing that their conduct was directed at and would be received by Plaintiffs.

133.    Plaintiffs suffered severe emotional distress.  Plaintiffs have suffered emotional and physical distress, humiliation, and mental anguish.  Plaintiffs have attended counseling and therapy since the underlying incidents to address the harm Defendants caused.  Plaintiffs have been plagued by depression, anxiety, anguish, fright, horror, worry, humiliation, shame, nightmares, insomnia, and paranoia, among other symptoms.

134.    Defendants' conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

135.    In so doing, Defendants acted with malice and oppression against Plaintiffs.

136.    The City of Vallejo is vicariously liable for the conduct of its employees under California Government Code § 815.2.

KERR
&
WAGSTAFFE
LLP

## SIXTH CAUSE OF ACTION
### (NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)
#### (Against All Defendants)

137.   Plaintiffs hereby incorporate paragraphs 1 through 136 herein.

138.   Defendants' conduct was negligent.

139.   Plaintiffs suffered severe emotional distress.  Plaintiffs have suffered emotional and physical distress, humiliation, and mental anguish.  Plaintiffs have attended counseling and therapy since the underlying incidents to address the harm Defendants caused.  Plaintiffs have been plagued by depression, anxiety, anguish, fright, horror, worry, humiliation, shame, nightmares, insomnia, and paranoia, among other symptoms.

140.   Defendants' conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

141.   In so doing, Defendants acted with malice and oppression against Plaintiffs.

142.   The City of Vallejo is vicariously liable for the conduct of its employees under California Government Code § 815.2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.   For general and special damages, according to proof;

2.   For a money judgment for emotional and physical distress, humiliation, and mental anguish, according to proof, with interest at the maximum legal rate, according to proof;

3.   Lost wages, according to proof;

4.   Compensation for litigation costs, expert witness fees, and attorneys' fees;

5.   For an award of punitive damages against the individual defendants, according to proof; and

6.   For such other and further relief as the court deems proper.



Date:  March 22, 2016                    **KERR & WAGSTAFFE LLP**

                                          By:   /s/ Kevin B. Clune
                                               KEVIN B. CLUNE

                                               Attorneys for Plaintiffs
                                               DENISE HUSKINS and AARON QUINN

28
COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

3        Plaintiffs Denise Huskins and Aaron Quinn hereby demand trial by jury in this action.

4

5

6

7   Date:  March 22, 2016                    **KERR & WAGSTAFFE LLP**

8

                                          By:   /s/ Kevin B. Clune
9                                                KEVIN B. CLUNE

10                                          Attorneys for Plaintiffs
                                            DENISE HUSKINS and AARON QUINN
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP