1  JAMES M. WAGSTAFFE (95535)
   wagstaffe@kerrwagstaffe.com
2  KEVIN B. CLUNE (248681)
   clune@kerrwagstaffe.com
3  KENNETH P. NABITY (287927)
   nabity@kerrwagstaffe.com
4  **KERR & WAGSTAFFE LLP**
   101 Mission Street, 18th Floor
5  San Francisco, CA 94105–1727
   Telephone: (415) 371-8500
6  Fax: (415) 371-0500

7  Attorneys for Plaintiffs
   DENISE HUSKINS and AARON QUINN
8

9
             **UNITED STATES DISTRICT COURT**
10
            **EASTERN DISTRICT OF CALIFORNIA**
11

12

   DENISE HUSKINS and AARON QUINN,        Case No. 2:16-cv-00603-TLN-EF
13
                  Plaintiffs,
14                                         **PLAINTIFFS' OPPOSITION TO
                                           DEFENDANTS' MOTION TO DISMISS
15         v.                              THE COMPLAINT**

16 CITY OF VALLEJO, a public entity, KENNY  Date: September 8, 2016
   PARK, MATHEW MUSTARD, and DOES 1-        Time: 2:00 p.m.
17 25,                                      Courtroom: 2, 15th Floor
                                            Judge: Hon. Troy L. Nunley
18                Defendants.
19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

# TABLE OF CONTENTS

*Page*

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 1

     A.     Plaintiffs Are Violently Assaulted and Huskins Is Kidnapped........................... 1

     B.     Defendants Ignore Critical Evidence and Aggressively Interrogate Quinn
          for Nearly 18 Hours ...................................................................................... 2

     C.     Huskins is Kidnapped and Raped Twice .......................................................... 4

     D.     VPD Accuses Huskins of Faking Her Own Kidnapping to Re-Live the
          Thrill of Prior Sexual Abuse .......................................................................... 4

     E.     Huskins Is Released in Huntington Beach, and VPD Accuses Her of a
          Crime Before Taking Her Statement ............................................................... 5

     F.     VPD Publicly Smears Huskins and Quinn........................................................ 6

     G.     VPD Continues To Attack Huskins and Quinn ................................................ 7

     H.     The FBI Arrests Matthew Muller for the Kidnapping ...................................... 8

III.   LEGAL STANDARD............................................................................................ 8

IV.    ANALYSIS............................................................................................................ 9

     A.     "Stigma Plus" Defamation ............................................................................... 9

     B.     Defamation ....................................................................................................... 10

          1.     Defendants' Conduct Is Not Privileged Under California Civil
               Code Section 47(b) .............................................................................10

               a)     Defendants' statements to the press are not statements
                    made in a judicial proceeding .....................................................10

               b)     Defendants' statements to the press were not made as part
                    of an "official proceeding"..........................................................12

               c)     Defendants' statements outside of the press release are also
                    unprotected..................................................................................14

           2.     Defendants' Conduct Is Not Immunized Under California
               Government Code Section 821.6 .........................................................15

     C.     False Arrest ...................................................................................................... 16

     D.     Intentional Infliction of Emotional distress ...................................................... 16

KERR
&
WAGSTAFFE
LLP

E.      Negligent Infliction of Emotional Distress ........................................................ 18

V.      CONCLUSION ............................................................................................................. 20

KERR
&
WAGSTAFFE
LLP

Case No. 2:16-cv-00603-TLN-EF                            PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

*Pages*

3

### <u>*Cases*</u>

4

*Blanco v. Cty. of Kings,*
   142 F. Supp. 3d 986 (E.D. Cal. 2015)..................................................16, 17

5

6

*Braun v. Bureau of State Audits,*
   67 Cal. App 4th 1382 (1998) ......................................................................13

7

*Brewster v. Cty. of Shasta,*
   112 F. Supp. 2d 1185 (E.D. Cal. 2000)......................................................16

8

9

*Buckley v. Fitzsimmons,*
   509 U.S. 259 (1993)..............................................................................13, 14

10

*Catsouras v. Dep't of California Highway Patrol,*
   181 Cal. App. 4th 856 (2010) .....................................................................19

11

12

*Cochran v. Cochran,*
   65 Cal. App. 4th 488 (1998) .......................................................................16

13

*Cole v. Fair Oaks Fire Prot. Dist.,*
   43 Cal. 3d 148 (1987) .................................................................................17

14

15

*Collier v. Simpson Papaer Co.,*
   133 F.3d 926 (9th Cir. 1997) ......................................................................16

16

*Cook v. Brewer,*
   637 F.3d 1002 (9th Cir. 2011) ...................................................................8, 9

17

18

*Cooper v. Dupnik,*
   924 F.2d 1520 (9th Cir. 1991) .....................................................................9

19

*Dinius v. Perdock,*
   2012 WL 1925666 (N.D. Cal. May 24, 2012) ............................................15

20

21

*Forro Precision, Inc. v. Int'l Bus. Machines Corp.,*
   673 F.2d 1045 (9th Cir. 1982) ....................................................................11

22

*Garmon v. Cty. of Los Angeles,*
   2016 WL 3606745 (9th Cir. July 5, 2016)..................................15, 16, 18

23

24

*GetFugu, Inc. v. Patton Boggs LLP,*
   220 Cal. App. 4th 141 (2013) ...............................................................10, 12

25

*Gobel v. Maricopa Cty.,*
   867 F.2d 1201 (9th Cir. 1989) .....................................................................9

26

27

*Hagberg v. California Fed. Bank FSB,*
   32 Cal. 4th 350 (2004) ................................................................................12

28

*Hawran v. Hixson,*
   209 Cal. App. 4th 256 (2012) .....................................................................12

*Herb Hallman Chevrolet, Inc. v. Nash-Holmes,*
  169 F.3d 636 (9th Cir. 1999) ............................................................ 9

*Imig v. Ferrar,*
  70 Cal. App. 3d 48 (1977) ............................................................ 13

*Klein v. Children's Hosp. Med. Ctr.,*
  46 Cal. App. 4th 889 (1996) ........................................................ 19

*Luong v. City & Cty. of San Francisco,*
  2012 WL 5869561 (N.D. Cal. Nov. 19, 2012) .................................. 15

*McMahon v. Craig,*
  176 Cal. App. 4th 1502 (2009) .................................................... 17

*Merritt v. County of Los Angeles,*
  875 F.2d 765 (9th Cir.1989) ........................................................ 9

*Milstein v. Cooley,*
  257 F.3d 1004 (9th Cir. 2001) .................................................... 10

*Myers v. City & Cty. of San Francisco,*
  2012 WL 4111912 (N.D. Cal. Sept. 18, 2012) ................................ 15

*Newman v. San Joaquin Delta Cmty. Coll. Dist.,*
  814 F. Supp. 2d 967 (E.D. Cal. 2011) .......................................... 17

*Palmer v. Zaklama,*
  109 Cal. App. 4th 1367 (2003) .................................................... 10

*Rothman v. Jackson,*
  49 Cal. App. 4th 1134 (1996) ................................................ 10, 14

*Rusheen v. Cohen,*
  37 Cal. 4th 1048 (2006) ............................................................ 13

*Silberg v. Anderson,*
  50 Cal.3d 205 (1990) ............................................................ 10, 11

*Soliz v. Williams,*
  74 Cal. App. 4th 577 (1999) ...................................................... 14

*Sullivan v. Cty. of Los Angeles,*
  12 Cal. 3d 710 (1974) .............................................................. 15

*Susan A. v. County of Sonoma,*
  2 Cal. App. 4th 88 (1991) ........................................................ 11

*Tucker v. City of Richmond,*
  2012 WL 2571314 (N.D. Cal. July 2, 2012) .................................. 15

*Williams v. City of Merced,*
  2013 WL 498854 (E.D. Cal. Feb. 7, 2013) ................................ 15, 18

KERR
&
WAGSTAFFE
LLP

Case No. 2:16-cv-00603-TLN-EF          PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

### *Statutes*

Cal. Civ. Code § 47 ................................................................................................. 10

Cal. Gov't Code § 815.2 ...................................................................................... 18, 20

Cal. Gov't Code § 821.6 ................................................................................ 10, 15, 18

Cal. Penal Code § 680 .............................................................................................. 18

### *Other Authorities*

Frank J. Menetrez, *Lawless Law Enforcement: The Judicial Invention of Absolute Immunity for Police and Prosecutors in California,*
49 Santa Clara L. Rev. 393 (2009) ...................................................................... 15

Restatement (Second) of Torts § 46, cmt. e (1965) ................................................. 17

### *Constitutional Provisions*

Cal. Const. art. I, § 13 ............................................................................................. 18

Cal. Const. art. I, § 28 ............................................................................................. 18

U.S. Const. amends. IV ............................................................................................ 18

U.S. Const. amends. XIV .......................................................................................... 18

## I.      INTRODUCTION

Defendants City of Vallejo, Kenny Park, and Mathew Mustard (collectively, "Defendants") waged a public relations assault against two victims of horrific crimes in order to provide cover for their own failed and inadequate investigation.  Among the numerous defamatory statements, Defendants publicly accused Plaintiffs Denise Huskins ("Huskins") and Aaron Quinn ("Quinn") (collectively, "Plaintiffs") of fabricating a kidnapping and sexual assault, demanded an apology from Plaintiffs, and thereby lit the fuse to an international media firestorm.  Defendants set out to destroy Plaintiffs' reputations and succeeded mightily.  Yet despite the fact that Defendants never had a shred of evidence in support of their wild accusations (and indeed intentionally ignored all evidence inconsistent with them) and the fact that an alleged kidnapper sits in jail awaiting trial for crimes he admitted to in emails and jailhouse interviews, Defendants still maintain they did nothing wrong in publicly destroying Plaintiffs' lives and reputations.

By their motion to dismiss, Defendants do not seek to justify their conduct, nor do they argue that their statements were true.  Instead, Defendants seek to dismiss just *some* of the claims against them, primarily by trying to stretch various state law privileges and immunities to the breaking point.  But law enforcement is not given free rein to abuse victims simply because such conduct involves the same subject matter as a police investigation, and thus none of their proffered privileges or immunities apply here.  For example, nothing in Civil Code section 47(b) covers gratuitous statements that perform no investigative function, such as statements to the press or to officers' friends and neighbors.  Similarly, binding Ninth Circuit authority – which Defendants do not so much as mention – holds that the immunity under Government Code section 821.6 for "instituting or prosecuting any judicial or administrative proceeding" applies *only* to claims for malicious prosecution.  Defendant's remaining arguments similarly lack merit or are uncontested.  Thus, Defendants' motion to dismiss should be denied.

## II.      BACKGROUND

### A.      PLAINTIFFS ARE VIOLENTLY ASSAULTED AND HUSKINS IS KIDNAPPED

On March 23, 2015, Plaintiffs were sleeping at Quinn's home, when one or more

1   intruders[1] broke into the home, blindfolded Plaintiffs, bound their hands and feet, and drugged

2   them.  (Compl. ¶ 12.)  The assailant instructed Quinn that Huskins would be kidnapped for

3   ransom, that Quinn was being monitored, and that the assailant would harm Denise if Aaron

4   went to the police.  (*Id.* ¶ 14.)  The assailant followed through on his threats and took Denise.

5   (*Id.*).  Quinn, confined to the couch, ultimately succumbed to sleep from effects of the strong

6   sedative the intruder had given him.  (*Id.* ¶ 15.)  When he awoke hours later he was terrified and

7   agonized for the next several hours about what to do.  (*Id.*)  He was afraid to leave the house or

8   call the police for fear that the kidnapper would harm Huskins.  (*Id.*)  In the intervening hours, he

9   received a number of texts and emails requesting a ransom for Huskins's release.  (*Id.*)  He

10  ultimately called the Vallejo Police Department ("VPD") to seek their help.  (*Id.* ¶ 16.)

11  **B.  DEFENDANTS IGNORE CRITICAL EVIDENCE AND AGGRESSIVELY INTERROGATE
          QUINN FOR NEARLY 18 HOURS**

12

13      VPD came to Quinn's home and immediately acted as if Quinn was the criminal rather

14  than the victim, focused solely on irrelevant evidence they thought might implicate him (such as

15  whether he had held a "party" the night before), and ignored key evidence of the crime (such as

16  evidence of forced entry to the house and batteries and other items left by the true kidnapper).

17  (*Id.* ¶ 17.)  Quinn then went with officers to the VPD station at 3:30 p.m., where he was

18  promptly and maliciously treated like he had already been convicted of murdering Huskins.  (*Id.*

19  ¶ 18.)  VPD took Quinn's clothing.  (*Id.* ¶ 19.)  In exchange, Quinn was given prison pants with

20  the words "Solano Prison" displayed on the side and a dirty white t-shirt, but no underwear or

21  socks.  (*Id.*)  They also took his blood and DNA.  (*Id.*)  The police placed Quinn in an

22  interrogation room, where he was cut off from any family or other visitors who would be able to

23  help him.  (*Id.*)  The room was accessible only to those who passed through doors with keypad

24  locks, and individuals who entered the room were required to offload their personal effects.  (*Id.*)

25

26

27  [1]     Plaintiffs believed that there were multiple people involved, although only one assailant
    (Matthew Muller) is currently being prosecuted for the crime.  For ease of reference, Plaintiffs
28  simply reference the "intruder" or "assailant" (singular).

VPD proceeded to interrogate Quinn aggressively for 18 straight hours.  (*Id.* ¶ 20.)  Det. Mustard and others repeatedly told Quinn they believed he was lying, that they did not want to hear anything else about any claimed intruders, and that they knew that Quinn had really killed Huskins.  (*Id.* ¶ 21.)  VPD told Quinn he would be branded a "cold, calculated monster," asked him whether he had ever seen a body after it had been exposed to the elements, and told him he was going to ruin his family's name.  (*Id.*)

VPD (including but not limited to Det. Mustard) led Quinn to believe that he was not free to leave during the marathon interrogation.  (*Id.* ¶ 22.)  For example, a sign on the inside of the door read "[t]his door is to remain closed at all times."  (*Id.*)  During the interrogation, they intentionally confined him in a small space without a clock, positioned themselves between Quinn and the doorway – physically blocking his ability to leave – and screamed at Quinn and invaded his personal space.  (*Id.*)  When Quinn had to use the bathroom, officers accompanied him and never left him alone.  (*Id.* ¶ 23.)  During the entire eighteen-hour interrogation, Quinn was given only two bottles of water, a travel-size bag of chips, and a slice of cold pizza.  (*Id.*)  At breaks, Quinn was left in the room alone, where he curled up in the rolling swivel chairs and cried.  (*Id.*)  They also kept Quinn incommunicado from his relatives, despite requests from both Quinn and his relatives that they be allowed to see each other.  (*Id.* ¶ 24.)  VPD falsely told Quinn that no one was there for him, in an apparent effort to coerce him to confess to a crime he did not commit.  (*Id.*)  Over twelve hours after Quinn's interrogation began – and approximately 24 hours after he had first been drugged and assaulted by the kidnapper – the investigating officers subjected Quinn to a lie detector test.  (*Id.* ¶ 26.)  Although there was no indication that Quinn lied in response to any question, Quinn was told that he had failed the test, and VPD continued to interrogate him even more aggressively.  (*Id.*)  Quinn demanded to speak to an attorney but the police kept him isolated from his attorneys for several more hours.  (*Id.* ¶ 28.)  At 6:00 a.m., VPD finally allowed Quinn to speak with his brother.  (*Id.* ¶ 30.)  Quinn's brother recognized Quinn was not free to leave, and assisted Quinn in finding an attorney by 9:00 a.m.  (*Id.*)

1    Despite the aggressive posturing, VPD did not have any evidence to charge Quinn with

2    any crime, and he was released after his attorney arrived.  (*Id.* ¶ 31.)  VPD delayed Quinn's

3    departure in an attempt to secure more media coverage of Quinn's release.  (*Id.*)  When VPD

4    finally allowed Quinn to leave, they tried to force Quinn – sleep deprived, hungry, and still

5    wearing the jail clothes from VPD – to exit the front of the station where numerous media outlets

6    had congregated at VPD's instruction.  (*Id.*)  Quinn's attorneys identified what VPD was doing

7    and secured a more discrete release.  (*Id.*)

8    **C.    HUSKINS IS KIDNAPPED AND RAPED TWICE**

9    When initially taken from Quinn's house, Huskins was transported several hours away in

10   the trunk of a car by the kidnapper.  (*Id.* ¶ 32.)  Huskins was forced into the bedroom of a home

11   and tied to the bed with zip ties and a bike lock.  (*Id.* ¶ 33.)  For the next day, Huskins remained

12   a hostage in this small room, and was forced to wear a blindfold made of blacked out swim

13   goggles when her captor entered the room.  (*Id.*)  Huskins was drugged repeatedly while held

14   captive, and raped multiple times.  (*Id.* ¶¶ 34-35.)  Following the second rape, the kidnapper told

15   Huskins that she would be released.  (*Id.* ¶ 37.)  The kidnapper threatened Huskins again, telling

16   her that when she spoke with the police or media she should never speak of the rape or of his

17   supposed military background.  (*Id.*)  Huskins was again drugged and blindfolded, as the

18   kidnapper drove for hours.  (*Id.* ¶ 38.)

19   **D.    VPD ACCUSES HUSKINS OF FAKING HER OWN KIDNAPPING TO RE-LIVE THE
20          THRILL OF PRIOR SEXUAL ABUSE**

21   While held captive, the kidnapper forced Huskins to record a "proof of life" tape, used to

22   prove that she was still alive.  (*Id.* ¶ 39.)  That recording was transmitted to the San Francisco

23   Chronicle on the afternoon of Tuesday, March 24, who shared it with VPD.  (*Id.*)  Shortly

24   thereafter, VPD had Huskins's mother and brother verified that her voice was the voice in the

25   recording.  (*Id.*)  During that encounter, VPD officers asked Huskins's mother if Huskins had

26   ever been kidnapped or assaulted before.  (*Id.* ¶ 40.)  Huskins's mother confided that Huskins

27   had been sexually molested when she was a child.  (*Id.*)  An officer, believed to be Defendant

28   Mustard, stated that the fact Huskins had previously been sexually abused made sense because,

KERR
&
WAGSTAFFE
LLP

4

in his experience, women who have already been sexually assaulted often pretend that it is happening again in order to gain attention and re-live the excitement of that experience.  (*Id.*)  He explained that this "fact," along with the evidence that Huskins was still alive, made it likely that Huskins was just making this whole incident up to get attention.  (*Id.*)

### E.   HUSKINS IS RELEASED IN HUNTINGTON BEACH, AND VPD ACCUSES HER OF A CRIME BEFORE TAKING HER STATEMENT

On March 25, 2015, after being kidnapped, assaulted, and detained for over two days, Huskins was released near her parents' homes in Huntington Beach.  (*Id.* ¶ 42.)  The Huntington Beach Police Department ("HBPD") observed "darker impression circles" around her eyes, consistent with Huskins's and Quinn's statements that they had been forced to wear swim goggles as blindfolds.  (*Id.* ¶ 43.)  Huskins also showed HBPD the shoes – which were too large for her feet – and water bottle the kidnapper had given her.  (*Id.*)  Huskins spoke with HBPD for nearly one hour about her kidnapping and release.  (*Id.*)  Still in shock from the kidnapping and fearful of retribution from a dangerous criminal still on the run, Huskins denied to HBPD that she had twice been sexually assaulted and did not mention that the kidnapper claimed to be ex-military.  (*Id.* ¶ 45.)  Huskins's account regarding the details of the home invasion entirely corroborated Quinn's.  (*Id.* ¶ 44.)

HBPD contacted VPD, and spoke with them for approximately one-half hour.  (*Id.* ¶ 46.)  Although VPD had neither seen nor spoken with Huskins, Mustard spoke with HBPD about the case, and ultimately spoke with Huskins's cousin who was on the scene.  (*Id.* ¶ 50.)  VPD's contact with Huskins – through Det. Mustard's call with Huskins's cousin – did not involve VPD asking about Huskins's condition or follow up on her story to help catch the dangerous predator that had just released her.  (*Id.* ¶ 51.)  Instead, Det. Mustard threatened and verbally attacked Huskins.  (*Id.*)  Det. Mustard told Huskins's cousin that VPD was offering a "proffer of agreement" for immunity.  (*Id.*)  Det. Mustard stated that Quinn had been at the station cooperating with VPD, and whoever accepted first would get immunity.  (*Id.*)  Det. Mustard told Huskins's cousin that he did not want to hear anything more about the claimed intruders, and demanded that she get on a small police jet back to Vallejo.  (*Id.*)  Given that Huskins had

1   "inconveniently" shown up alive, VPD maliciously transitioned to the hoax story to avoid

2   criticism for its initial and utterly false accusations of murder.  (*Id.*)

3          Huskins learned about VPD's prior assertions that Quinn murdered Huskins and its new

4   assertions that both Huskins and Quinn had faked the entire story.  Fearful that VPD would place

5   her back in a confined area and subject her to additional trauma, and that she was unjustly being

6   painted as a suspect in a crime rather than as the victim that she truly was, Huskins took a

7   commercial flight back to the Bay Area.  (*Id.* ¶ 55.)  Huskins travelled alone with a borrowed cell

8   phone, cowering wherever she could to avoid the press, police, or kidnapper, each of which she

9   reasonably believed were still after her.  (*Id.*)

10         F.      **VPD PUBLICLY SMEARS HUSKINS AND QUINN**

11         Even before Huskins's plane touched down in the Bay Area, VPD began a dramatic

12  public relations assault on her and Quinn.  (*Id.* ¶ 58.)  First, VPD issued a press release to the

13  public, stating in part: "Today, there is no evidence to support the claims that this was a stranger

14  abduction or an abduction at all.  Given the facts that have been presented thus far, this event

15  appears to be an orchestrated event and not a kidnapping."  (*Id.*)

16         At a press conference held that same evening at approximately 9:27 p.m., Lt. Park made

17  the following statements, each of which were false:

18         o       "We also know that the statement that Mr. Quinn provided was such an
                   incredible story, we initially had a hard time believing it, and, upon further
19                 investigation, *we were not able to substantiate any of the things that he
                   was saying*."
20

21         o       ". . . *Mr. Quinn and Ms. Huskins has plundered valuable resources away
                   from our community, and has taken the focus away from the true victims of
22                 our community*, while instilling fear amongst our community
                   members.  So, if anything, it is *Mr. Quinn and Ms. Huskins* that *owes this
23                 community an apology*."

24         o       "If you can imagine devoting all of our resources, 24 hours a day, *on what
                   I will – uh - classify as a wild goose chase* – it's a tremendous loss.  It's
25                 disappointing, it's disheartening, and *the fact that we've essentially wasted
                   all of these resources, for essentially nothing, is upsetting*."
26

27         o       Question: "Is there any evidence that makes you know, conclusively, that
                   this was a fake?  I mean, did something come up that made it without
28                 argument that this was all a hoax?"

KERR
&
WAGSTAFFE
LLP

Case No. 2:16-cv-00603-TLN-EF                    6          PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Lt. Park: "*I can tell you that our investigation has concluded that none of the claims has been substantiated.  I can go one step further to say this – that this was not a random act, and that the members of our community are safe, and that they have nothing to fear.*"

(*Id.* ¶ 60.)

Each statement was undeniably false and despicable – VPD, a professional law enforcement organization, formally accused two victims of a horrific home invasion and kidnapping of falsifying the entire incident.  (*Id.* ¶ 61.)  Lt. Park and VPD knew that it is a crime to provide false statements to the police, and indicated that Huskins and Quinn had committed that crime.  (*Id.*)  Lt. Park's public statements were delivered with malice and careless disregard for the truth to cover up VPD's own incompetence.  (*Id.*)  VPD and Lt. Park had no evidence to support the false and disparaging comments made so publicly during an open investigation.  (*Id.* ¶ 62.)

Within minutes of VPD's false statements that Huskins's kidnapping was a hoax, VPD had successfully and widely spread its hoax theory, turning a local disappearance into a worldwide media frenzy proliferating VPD's public smearing of Huskins and Quinn.  (*Id.* ¶ 64.)  News outlets across the world likened Huskins to the lead character in the film "Gone Girl," [2] and placed Huskins's picture next to that of the lead character, including one depicting the character naked and covered in blood.  (*Id.*)  Nancy Grace took to television displaying the Twitter hashtag "#kidnappinghoax."  (*Id.*)

On information and belief, VPD gratuitously made numerous additional false and otherwise defamatory statements about Huskins and Quinn to others without any valid law enforcement purpose.  (*Id.* ¶ 47.)

G.    **VPD CONTINUES TO ATTACK HUSKINS AND QUINN**

Shortly after Huskins landed in San Francisco, Huskins's attorney told VPD that she would cooperate with its investigation.  (*Id.* ¶ 67.)  Huskins's attorney also told VPD that Huskins wished to submit to a sexual assault exam as soon as possible.  (*Id.*)  VPD demeaned the

[2]    "Gone Girl" is a fictitious book-turned-to-film about a cheating husband accused of killing his wife.  A final twist reveals that, rather than being kidnapped, the wife elaborately faked her disappearance to frame the husband as revenge for his infidelity.

KERR & WAGSTAFFE LLP

1    exam request and responded that the sexual assault exam could wait.  (*Id.*)  A law enforcement

2    official on the case told Huskins's attorney to watch "Gone Girl" to understand their

3    investigation.  (*Id.*)  VPD both publicly and privately implied that Huskins had lied about being

4    sexually assaulted, patronizingly and misogynistically implying that she could not have been

5    raped unless she had grievous physical injuries.  (*Id.*)  On information and belief, VPD never

6    tested Huskins's SART test.  (*Id.* ¶ 68.)

7         Huskins ultimately spoke with VPD for nearly two full days about her captivity and

8    sexual assaults.  (*Id.* ¶ 69.)  Nothing Huskins said provided any additional justification to the

9    public statements Lt. Park made about her on behalf of VPD, yet VPD focused intently on

10   proving up its "Gone Girl" case.  (*Id.*)

11        **H.    THE FBI ARRESTS MATTHEW MULLER FOR THE KIDNAPPING**

12        In June 2015, Matthew Muller was arrested in connection with a similar invasion and

13   assault.  (*Id.* ¶ 75.)  On July 13, 2015, an unsealed FBI affidavit detailed Muller's purported

14   involvement in Huskins's kidnapping.  (*Id.* ¶ 76.)  The 50-page affidavit mirrored the accounts of

15   Plaintiffs and directly contradicts VPD's public statements.  On July 20, 2015, the City of

16   Vallejo admitted privately that "it is clear now that there was a kidnapping on March 23, 2015,

17   that it was not a hoax or orchestrated event and that VPD conclusions were incorrect."  (*Id.* ¶ 80.)

18   But even then, VPD still maintained that it had done nothing wrong given "the information that

19   was available at the time."  In the meantime, Huskins and Quinn's lives and reputations were

20   completely destroyed.

21   **III.   LEGAL STANDARD**

22        "A Rule 12(b)(6) motion tests the legal sufficiency of a claim."  *Cook v. Brewer*, 637

23   F.3d 1002, 1004 (9th Cir. 2011) (citations and internal quotations omitted).  "A claim may be

24   dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of

25   his claim which would entitle him to relief."  *Id.* (citations and internal quotations omitted).  "To

26   survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

27   to state a claim to relief that is plausible on its face."  *Id.* (citations and internal quotations

28   omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

KERR
&
WAGSTAFFE
LLP

1   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

2   *Id.* (citations and internal quotations omitted).

3   **IV.   ANALYSIS**

4       A.   "STIGMA PLUS" DEFAMATION

5       Plaintiff Quinn has stated a valid cause of action for "stigma plus" defamation because

6   the harm he alleges is not "purely reputational" under binding Ninth Circuit precedent but

7   instead occurred in conjunction with Plaintiff Quinn's unlawful arrest and interrogation.  "There

8   are two ways to state a cognizable § 1983 claim for defamation-plus: (1) allege that the injury to

9   reputation was inflicted *in connection* with a federally protected right; or (2) allege that the

10  injury to reputation *caused the denial* of a federally protected right."  *Herb Hallman Chevrolet,*

11  *Inc. v. Nash-Holmes*, 169 F.3d 636, 645 (9th Cir. 1999) (emphasis in original).  Thus, where

12  defamatory statements are made in conjunction with an "unconstitutional arrest (in violation of

13  the Fourth Amendment) . . . the necessary plus of the stigma-plus requirement" has been meet.

14  *Cooper v. Dupnik*, 924 F.2d 1520, 1534 (9th Cir. 1991), *aff'd in relevant part en banc*, 963 F.2d

15  1220 n.6 (9th Cir. 1992); *see also Gobel v. Maricopa Cty.,* 867 F.2d 1201, 1205 (9th Cir. 1989),

16  *abrogated on other grounds by Merritt v. County of Los Angeles*, 875 F.2d 765 (9th Cir. 1989)

17  ("Gobel and DeFranco have stated a proper section 1983 claim, however, because they alleged

18  that the false statements were made in connection with their illegal arrest.").

19      Here, Plaintiff Quinn has alleged that the defamatory statements about him were made in

20  conjunction with his unlawful custodial interrogation and false arrest in violation of his Fourth

21  and Fourteenth Amendment Rights.  (Compl. ¶¶ 112-118).  And, for purposes of this motion to

22  dismiss, Defendants do not even attempt to contend that Quinn has not stated a valid § 1983

23  cause of action concerning the unlawful nature of the arrest, and indeed have admitted in

24  correspondence to Plaintiffs that such claims were "sufficiently pled."  (Clune Decl. Ex. F.)

25  Thus, Quinn has stated a valid cause of action for "stigma plus" defamation against Defendants.[3]

26

27  _____

28  [3]     Plaintiffs do, however, concede that Huskins' employment-related injuries are
    insufficient to satisfy the "plus" requirement for her alone.

1    **B.    DEFAMATION**

2         Defendants do not argue that the statements giving rise to Plaintiffs' claims were true or

3    dispute that they acted with malice.  Instead, Defendants ask this Court to hold their campaign of

4    malicious disparagement absolutely privileged under California Civil Code section 47(d) or

5    California Government Code section 821.6.  Because neither statute applies here, this Court

6    should deny Defendants' motion to dismiss as to Plaintiffs' defamation claim.  Defendants bear

7    the burden of demonstrating the applicability of these defenses.  *Milstein v. Cooley*, 257 F.3d

8    1004, 1008 (9th Cir. 2001); *Palmer v. Zaklama*, 109 Cal. App. 4th 1367, 1380 (2003).

9         **1.    Defendants' Conduct Is Not Privileged Under California Civil Code
              Section 47(b)**

10

11        *a)    Defendants' statements to the press are not statements made in a
              judicial proceeding*

12        Defendants argue that their statements to the press are protected as part of a "judicial

13   proceeding" under section 47(b)(2).  (Mot. 6.)  But a press conference is not a judicial

14   proceeding, and California courts have routinely held that statements made to the general public

15   about judicial proceedings are not protected under section 47(b)(2).  "The principal purpose of

16   the litigation privilege 'is to afford litigants and witnesses the utmost freedom of access to the

17   courts without fear of being harassed subsequently by derivative tort actions.'"  *GetFugu, Inc. v.*

18   *Patton Boggs LLP*, 220 Cal. App. 4th 141, 152 (2013) (citation omitted).  The litigation privilege

19   "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants

20   or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that

21   have some connection or logical relation to the action."  *Id.* at 152 (quoting *Silberg v. Anderson*,

22   50 Cal. 3d 205, 212 (1990)).

23        For the privilege to apply, there must be a "*functional* connection" to the litigation itself.

24   *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1141 (1996).  Thus, for example, statements made

25   in pleadings, demand letters, and investigatory interviews are protected as logically related to the

26   judicial proceedings.  *Id.* at 1148 (collecting cases).  But press conferences explaining one

27   party's position on potential or actual litigation to the general public are not protected.  *Id.* at

28   1148-49 (involving a press conference in response to potential criminal and civil tort allegations

1   of child abuse); *see also Susan A. v. County of Sonoma*, 2 Cal. App. 4th 88, 93 (1991) (after a

2   public defender retained a psychologist to interview a criminal defendant, subsequent statements

3   by that psychologist to the press about what she learned in in that interview were not privileged).

4   That is because "republications to nonparticipants in the action are generally not privileged under

5   section [47(b)] . . . ." *Silberg*, 50 Cal. 3d at 219.  Here, Defendants' statements in the March 25,

6   2015 press conference and in related press releases were not distributed to participants or

7   witnesses in the litigation – they were sent broadly to the national news media at large.  (Compl.

8   ¶ 89.)  As such, they are not protected under section 47(b).

9        Defendants point to authority suggesting that statements made *to police* are protected by

10   the privilege because they can *prompt* and facilitate investigations that are prerequisites to

11   criminal prosecution.  (Mot. 5-6 (citing *Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673

12   F.2d 1045, 1055 (9th Cir. 1982).)  But the press release and later statements to the media here

13   clearly did not have the function of *investigating* Huskins and Quinn, nor were they

14   communications directed at other law enforcement agencies aimed to *prompt* further

15   investigation of them.  Instead, they were wholly extraneous statements made to the public at

16   large, which were separate and apart from the actual investigation.  Indeed, the actual substance

17   of the communications indicated that, as far as the police were concerned, there was no

18   kidnapper and thus no need for further investigation of the supposedly invented crime.  (See,

19   e.g., Compl. ¶ 89 ("I can tell you that *our investigation has concluded* that none of the claims has

20   been substantiated. I can go one step further to say this – that this was not a random act, and that

21   *the members of our community are safe, and that they have nothing to fear*.").)  As such, there is

22   no sense in which these press communications by the police furthered the investigation itself,

23   much less performed a function that was a prerequisite to any criminal prosecution.  Thus, they

24   are not protected.

25        Defendants may try and argue that the public had a "substantial interest" in the potential

26   criminal case given the threat to public safety posed by the a kidnapper being on the loose, and

27   therefore may contend that the statements should still be protected by 47(b)(2), pointing to

28   certain case law including within the privilege's protections certain nonparties with a "substantial

interest" in the proceeding.  But, any such construction of the privilege that would extend it to statements made to the general public on issues of "public interest" has been repeatedly rejected by California courts because that "would swallow up the general rule, which [the California Supreme Court ... reaffirmed, that [the litigation privilege] does not privilege 'republications to nonparticipants in the action . . . '"  *GetFugu,* 220 Cal. App. 4th at 153 (citations omitted).  Thus, the general public cannot be said to be anything close to a "participant" in the proceedings and Defendants' statements to the public via the press are not part of a "judicial proceeding" under section 47(b)(2).

> b) *Defendants' statements to the press were not made as part of an "official proceeding"*

Defendants also argue that anything a police officer does in any way related to an investigation *necessarily* constitutes an "official proceeding" authorized by law under section 47(b)(3), and therefore *any communication* about the investigation is *absolutely* privileged by law as long as it happened to be uttered by a police officer.  (Mot. 5.)  No case law supports Defendants' sweeping view of this privilege.

California courts have relied almost exclusively on the same authority applicable to "judicial proceedings" under section 47(b)(2) (discussed above) in developing the case law applicable to "official proceedings" under section 47(b)(3).  In so doing, they have reasoned "*[b]y analogy to* cases extending the litigation privilege to statements made outside the courtroom."  *Hagberg v. California Fed. Bank FSB*, 32 Cal. 4th 350, 362 (2004).  But nothing suggests that the "official proceeding" privilege should somehow extend *beyond* what the litigation privilege itself would cover to protect communications whose function is *neither* to investigate nor to prompt officials to investigate.  "[T]he communication must still be 'in furtherance of the objects' of the proceeding" – namely the *investigation* – and "not be extraneous to the [proceeding]."  *Hawran v. Hixson*, 209 Cal. App. 4th 256, 282–83 (2012) (alteration in original) (suggesting but not deciding that a statement made in a press release about an SEC investigation was not protected by the "official proceeding" privilege because it did not further the purposes of the SEC investigation.")  As explained above, Defendants' statements in

1   press releases and during a press conference on March 25, 2015 in no way performed the

2   function of investigating Huskins and Quinn, nor was their function to prompt any investigation

3   by others.  Instead, they were wholly "extraneous" statements made to the public at large,

4   separate and apart from the actual investigation and are thus not protected.

5       None of the cases that Defendants cite in their brief state otherwise.  For example, *Braun*

6   *v. Bureau of State Audits* concerned statements contained in a final audit report that the state

7   auditor was required by law to create and report to "official administrative agencies."  67 Cal.

8   App  4th 1382, 1390 (1998).  Unsurprisingly, the Court held that statements made in the report

9   itself were entirely privileged.  Here, unlike *Braun*, the statements to the press were in no way

10  made as part of an investigative report; indeed, they served no investigative function whatsoever.

11  Likewise, *Imig v. Ferrar* merely restates the rule that communications serving to prompt an

12  internal affairs investigation are privileged, 70 Cal. App. 3d 48, 55 (1977), which is not what

13  happened here.

14      Finally, it is important to put Defendants' sweeping interpretation of the privilege in

15  context to show how out of touch it is with the common law immunities on which the privilege is

16  based.  "The privilege recognized in section 47 derives from common law principles establishing

17  a defense to the tort of defamation."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006).  Under

18  that common law, "while prosecutors, like all attorneys, were entitled to absolute immunity from

19  defamation liability for statements made during the course of judicial proceedings and relevant to

20  them, most statements made out of court received only good-faith immunity" – not absolute

21  immunity irrespective of malice.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 277 (1993) (citations

22  omitted).  From this, the Supreme Court has held that the absolute protections of the litigation

23  privilege cannot possibly apply to statements to the press, even if made by prosecutors:

24          Comments to the media have no functional tie to the judicial process just because
            they are made by a prosecutor. . . . The conduct of a press conference does not
25          involve the initiation of a prosecution, the presentation of the state's case in court,
            or actions preparatory for these functions. Statements to the press may be an
26          integral part of a prosecutor's job . . . and they may serve a vital public function.
            But in these respects a prosecutor is in no different position than other executive
27          officials who deal with the press, and, as noted above qualified immunity is the
            norm for them.

28

*Id.* at 277-78 (cross reference omitted); *see also Soliz v. Williams*, 74 Cal. App. 4th 577, 590-91, 595 (1999).  So too here, it would be completely inconsistent with the common law underpinnings of section 47(b) to hold that *police officers* – who are even further removed from courtroom proceedings – are somehow entitled to *absolute* immunity for anything they say in any way touching on an investigation simply because those statements happened to have been uttered by a police officer.  That would immunize knowingly false statements made to satisfy personal vendettas, even if the communication in no way prompts or furthers the investigation and was made simply to gratuitously injure an innocent victim.  Such an interpretation cannot be squared with the public balancing of interests the privilege was designed to maintain.  *See Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1147 (1996) (holding that the "balancing of interests . . .disfavors application of the litigation privilege to spiteful and harmful slurs made outside of the precincts which the privilege exists to shelter").

c)      *Defendants' statements outside of the press release are also*
*unprotected.*

Defendants do not address Plaintiffs' allegations, made on information and belief, that Defendants made additional gratuitous and entirely malicious statements about Plaintiffs over and above what they said in the press conference as part of their campaign to destroy Plaintiffs' lives and reputations and cover up their own incompetence.  (Compl. ¶¶ 47, 86.)  Thus, for example, if Defendants made statements to their friends, relatives, neighbors, or other non-witnesses repeating the same malicious and untruthful statements they made to an internationally televised audience, such communications can in no way be said to have been made as part of a "judicial proceeding" or other "official proceeding."  As such, there is no conceivable immunity for these additional statements.[4]

---

[4]      In the alternative, Plaintiffs should be given leave to amend to add in additional facts, especially in light of their pending request, pursuant to Rule 56(d), to obtain additional evidence on these issues.  (*See* Wagstaffe Rule 56 Decl., filed concurrently herewith.)



KERR
&
WAGSTAFFE
LLP

14

1

2

### 2.   Defendants' Conduct Is Not Immunized Under California Government Code Section 821.6

3

Under binding Ninth Circuit precedent, California Government Code section 821.6 does

4 not immunize Defendants' conduct against claims of defamation.  Section 821.6 states that "[a]

5 public employee is not liable for injury caused by his *instituting* or *prosecuting* any judicial or

6 administrative proceeding within the scope of his employment, even if he acts maliciously and

7 without probable cause."  Cal. Gov't Code § 821.6 (emphasis added).  The Ninth Circuit has

8 recently held that this statute applies *only* to claims for malicious prosecution against public

9 employees, but not other tort claims.  *Garmon v. Cty. of Los Angeles*, No. 12-55109, _ F.3d _,

10 2016 WL 3606745, at *7 (9th Cir. July 5, 2016).  In so doing, the Ninth Circuit followed

11 authority directly from the California Supreme Court, "'confining [section 821.6's] reach to

12 malicious prosecution actions.'"  *Id.* (quoting *Sullivan v. Cty. of Los Angeles*, 12 Cal. 3d 710,

13 720 (1974)).  As other courts have noted, limiting 821.6 to malicious prosecution claims (and

14 thus not allowing it to immunize any action that happens to be part of a police investigation) is

15 necessary as a matter of public policy.  That is because "interpreting Section 821.6 to apply to all

16 tort claims would create 'a regime of lawless law enforcement in California' by giving the

17 'state's law enforcement authorities a license to kill or to do any other damage that strikes their

18 fancy, even maliciously and without probable cause, as long as they do it in the course of

19 investigating crime.'"  *Dinius v. Perdock*, No. C 10-3498 MEJ, 2012 WL 1925666, at *9 (N.D.

20 Cal. May 24, 2012) (quoting Frank J. Menetrez, *Lawless Law Enforcement: The Judicial*

21 *Invention of Absolute Immunity for Police and Prosecutors in California,* 49 Santa Clara L. Rev.

22 393, 426 (2009) (extensively analyzing legislative history of section 821.6)).[5]

23

While it is true that some decisions from California's lower courts had previously

24

_____

25 [5]        Numerous other federal district court decisions had previously reached the same

26 conclusion.  *See*, *e.g.*, *Williams v. City of Merced*, No. 1:10-CV-01999-MJS, 2013 WL 498854, at *17 (E.D. Cal. Feb. 7, 2013); *Tucker v. City of Richmond*, No. C 12-1829 MEJ, 2012 WL

27 2571314, at *5 (N.D. Cal. July 2, 2012); *Myers v. City & Cty. of San Francisco*, No. C 08-1163 MEJ, 2012 WL 4111912, at *7 (N.D. Cal. Sept. 18, 2012); *Luong v. City & Cty. of San*

28 *Francisco*, No. C11-5661 MEJ, 2012 WL 5869561, at *8 (N.D. Cal. Nov. 19, 2012).

KERR
&
WAGSTAFFE
LLP

15

1  reached a different conclusion, and read section 821.6 much more expansively, the Ninth Circuit

2  expressly rejected these decisions as misguided and inconsistent with California Supreme Court

3  precedent, and the statute's legislative history.  *Garmon*, 2016 WL 3606745, at *7.  Defendants

4  only cite to the same California Court of Appeals cases that the Ninth Circuit rejected.  (*See* Mot.

5  6-7.)  This Court is bound to follow the Ninth Circuit on matters of state law, even if it conflicts

6  with lower California courts of appeals.  *See Brewster v. Cty. of Shasta*, 112 F. Supp. 2d 1185,

7  1188 & n.5 (E.D. Cal. 2000), *aff'd*, 275 F.3d 803 (9th Cir. 2001).  Here, Plaintiffs plainly do not

8  bring a claim for malicious prosecution.  Instead, Plaintiffs brought state tort claims for

9  defamation.  The Ninth Circuit makes clear that section 821.6 does not immunize Defendants'

10  conduct in this regard.

11  **C.  FALSE ARREST**

12     Although Defendants do not dispute that Plaintiff Quinn has stated a claim against Det.

13  Mustard and the City for false arrest, they correctly note that Quinn did not plead a false arrest

14  claim against Lt. Park.  Plaintiffs admit that they did not intend to plead any false arrest claim

15  solely as to Lt. Park, and that any such claim is not part of this action.

16  **D.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

17     By violating the civil rights of and publicly attacking the recent victims of a horrendous

18  crime to cover up their own failed investigation, Defendants' conduct is sufficiently extreme and

19  outrageous for Plaintiffs' claim of Intentional Infliction of Emotional Distress ("IIED") to

20  survive.  "Generally, conduct will be found to be actionable where the 'recitation of the facts to

21  an average member of the community would arouse his resentment against the actor, and lead

22  him to exclaim, 'Outrageous!'"  *Blanco v. Cty. of Kings*, 142 F. Supp. 3d 986, 1002 (E.D. Cal.

23  2015) (quoting *Cochran v. Cochran,* 65 Cal. App. 4th 488, 494 (1998)).  "Because whether a

24  defendant's conduct was extreme and outrageous is ordinarily a question for the jury, [the court]

25  may grant summary judgment only if no reasonable jury would find [the] conduct to have been

26  so extreme and outrageous as to warrant recovery."  *Collier v. Simpson Papaer Co.*, 133 F.3d

27  926 (9th Cir. 1997).

28     Behavior may be extreme and outrageous if the defendant knows that the plaintiff is

1  vulnerable.  *McMahon v. Craig*, 176 Cal. App. 4th 1502, 1516 (2009).  Additionally, behavior

2  may be considered outrageous if the defendant "abuses a relation or position which gives him

3  power to damage the plaintiff's interests."  *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148,

4  170 n.7 (1987).  Because of their position of authority, police officers are often liable for IIED.

5  *See* Restatement (Second) of Torts § 46, cmt. e (1965) ("In particular police officers, school

6  authorities, landlords, and collecting creditors have been held liable for extreme abuse of their

7  position."); *see also Blanco*, 142 F. Supp. 3d at 1002 (court found reasonable trier of fact could

8  find extreme and outrageous conduct where plaintiff pled that a police officer "retaliate[d]

9  against her for previously refusing to submit to his earlier interrogation" by continuing an

10  interrogation during a strip search); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 814 F.

11  Supp. 2d 967, 979 (E.D. Cal. 2011) ("An unprovoked attack by a police officer could be

12  considered extreme and outrageous conduct.").

13      Here, Defendants' unprovoked attacks targeted recent victims of a terrifying crime –

14  assault, abduction, kidnapping, and rape – while asserting an authoritative position over

15  Plaintiffs.  Among other allegations in the Complaint, Quinn alleges that he alerted Defendants

16  that he had been attacked, drugged, and that his girlfriend was kidnapped (all true).  (Compl. ¶¶

17  17, 12-14.)  In response, Defendants denied Quinn his Fourth Amendment rights (a claim not

18  contested by this motion or anywhere at the pleading stage), forced him to continue an 18-hour

19  interrogation while at his most vulnerable, and attempted to humiliate Quinn by forcing him to

20  leave the police station through the front door while still wearing the prison pants (with no

21  underwear), dirty white shirt, and no socks.  (*Id.* ¶¶ 18-20, 31.)  Additionally, following the

22  release of Huskins, and before ever speaking with her, Defendants waged a public relations

23  assault against these vulnerable Plaintiffs that they knew would create an international media

24  firestorm.  (*Id.* ¶¶ 58-64.)  Defendants publicly accused Plaintiffs of fabricating the entire

25  intrusion and kidnapping (and thereby claimed Plaintiffs had committed a crime), wasting the

26  resources of the citizens of Vallejo, and demanded an apology on behalf of the community.  (*Id.*

27  ¶ 60.)  Defendants knew that this conduct would destroy Plaintiffs' reputations and ostracize

28  them from their own community.  Further, Defendants' attack was completely unprovoked,

KERR
&
WAGSTAFFE
LLP

17

1    unsubstantiated by any evidence, and made to cover for their own disastrous investigation and

2    give the public a false sense of security.  (*Id.* ¶¶ 61-62.)  Defendants' national media assault

3    occurred at approximately 9:30 p.m. – less than twelve hours after Huskins was released.  (*Id.* ¶

4    60.)  When the attack commenced, Plaintiffs remained traumatized and vulnerable, which

5    Defendants knew or should have known.  (*Id.* ¶¶ 127-136.)  Defendants also knew or should

6    have known that their statements, although disseminated indiscriminately, would reach Plaintiffs.

7    (*Id.*)  Thus, a reasonable juror could find this conduct outrageous.

8          Defendants' remaining challenges to the IIED claim likewise lack merit.  As explained

9    above, California Government Code section 821.6 applies only to malicious prosecution claims

10   and thus does not immunize Plaintiff's IIED claim.  *Garmon*, 2016 WL 3606745, at *7;

11   *Williams*, 2013 WL 498854, at *17 (E.D. Cal. Feb. 7, 2013) ("[S]ection 821.6 does not

12   automatically immunize Defendant's investigatory conduct against Plaintiff's IIED claim").

13         In addition, Defendants allege that they are not liable (under Government Code section

14   845) for damages resulting from "not freeing Huskins from her captor sooner," such as those

15   Huskins suffered at the hands of the kidnapper.  (Mot. at 10.)  But, although Defendants may be

16   morally culpable in this regard, Plaintiffs do not seek through this lawsuit damages for such

17   injuries.  Defendant City of Vallejo is also vicariously liable for the conduct of its employees.

18   *See* Cal. Gov't Code § 815.2.  Thus, Plaintiffs have stated a valid IIED claim.

19                    **E.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

20         Defendants claim – without any analysis – that Plaintiffs have failed to plead the requisite

21   duty in support of their claim for negligent infliction of emotional distress ("NIED").  But

22   Defendants have numerous independent duties to Plaintiffs, each of which Plaintiffs alleged in

23   their Complaint.  For example, it is undisputed that Defendants possessed a legal duty to not

24   unreasonably seize or falsely arrest or imprison Quinn.  *See* U.S. Const. amends. IV & XIV; Cal.

25   Const. art. I, § 13.  Likewise, the California Constitution creates a legal duty requiring law

26   enforcement to avoid "intimidation, harassment, and abuse" of victims such as Plaintiffs.  Cal.

27   Const. art. I, § 28.  Huskins is also owed special protections as a sexual assault victim.  *See* Cal.

28   Penal Code § 680.  Additionally, in *Catsouras v. Dep't of California Highway Patrol*, 181 Cal.

App. 4th 856 (2010), the court held that law enforcement officials "owed a duty of care to plaintiffs not to place decedent's death images on the Internet for the lurid titillation of persons unrelated to official CHP business." *Id.* at 886.  Like *Catsouras*, Plaintiffs here have similarly alleged that Defendants' public relations campaign was designed to destroy their reputations and hide information regarding Defendants' abusive and disastrous investigation, and not in furtherance of any official or judicial proceeding.  (*See* discussion *supra* pp. 10-14; Compl. ¶¶ 58-64.)

In additional to specific legal obligations, the California Supreme Court also has articulated a number of factors for consideration when determining the existence of a duty for negligent infliction of emotional distress, each of which weigh in favor of liability here, and which Defendants fail to address or discuss entirely:

> The foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Klein v. Children's Hosp. Med. Ctr.*, 46 Cal. App. 4th 889, 896 (1996).  Here, with respect to the public relations assault and subsequent treatment of Plaintiffs, it is entirely foreseeable that Defendants' conduct would cause harm in the form of emotional distress to Plaintiffs. Defendants knew that Plaintiffs reported a horrendous crime and their disparaging and unreasonable statements – both publicly and privately – were likely to destroy Plaintiffs' reputation and ostracize them from their community.  Second, Defendants do not doubt, in any way, that Plaintiffs suffered injury, and admitted as much in their private non-apology letter. (Compl. ¶ 80.)  Third, Defendants' conduct was intimately connected to the injury suffered. Overnight, Plaintiffs went from victims of a horrific crime to being portrayed as criminals themselves, and Huskins, specifically, was forever branded the "Real Life Gone Girl."  (*Id.* ¶ 64.)  Fourth, there is extensive moral blame attached to Defendants' conduct – Defendants attacked the victims of a crime to hide the deficiencies of their own disastrous investigation and provided the community with a false sense of security.  (*Id.* ¶¶ 58-64.)  Fifth, recognizing

1  liability here will prevent future harm.  Law enforcement personnel will be deterred from

2  spreading false and malicious lies about victims of crime for self-interested reasons.  Sixth, the

3  burden to Defendants here is limited to the facts of this case, and would protect members of the

4  community from similar harm.[6]  (*Id.* ¶¶ 72-76.)  Accordingly, Plaintiffs have adequately alleged

5  a duty sufficient to support a NIED claim.

6          The remaining arguments against Plaintiffs' NIED claim are also baseless. This is not a

7  claim for malicious prosecution, so Government Code section 821.6 does not apply.  Defendants

8  are mistaken that Plaintiff's NIED claim seeks damages for Defendants "not freeing Huskins

9  from her captor sooner."  (Mot. at 10.)  And Defendant City of Vallejo is vicariously liable for

10  the conduct of its employees.  *See* Cal. Govt. Code § 815.2.  Thus, Plaintiffs have sufficiently

11  stated a claim for NIED against all Defendants.

12  **V.      CONCLUSION**

13          For the aforementioned reasons, Plaintiffs respectfully request that the Court deny

14  Defendants' motion to dismiss.  Should the motion be granted in any part, Plaintiffs request

15  leave to amend.

16

17  Date:  August 25, 2016                          **KERR & WAGSTAFFE LLP**

18

19                                        By:    /s/ Kevin B. Clune
                                                 KEVIN B. CLUNE

20
                                                 Attorneys for Plaintiffs
21                                               DENISE HUSKINS and AARON QUINN

22

23

24

25

26

27  _____

28  [6]       As to the seventh factor, Plaintiffs have no information concerning Defendants' insurance
    because Defendants refuse to provide it in discovery.



Case No. 2:16-cv-00603-TLN-EF                              PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS