1  JAMES M. WAGSTAFFE (95535)
   wagstaffe@kerrwagstaffe.com
2  KEVIN B. CLUNE (248681)
   clune@kerrwagstaffe.com
3  KENNETH P. NABITY (287927)
   nabity@kerrwagstaffe.com
4  **KERR & WAGSTAFFE LLP**
   101 Mission Street, 18th Floor
5  San Francisco, CA 94105–1727
   Telephone: (415) 371-8500
6  Fax: (415) 371-0500

7  Attorneys for Plaintiffs
   DENISE HUSKINS and AARON QUINN

8

9                    **UNITED STATES DISTRICT COURT**

10                   **EASTERN DISTRICT OF CALIFORNIA**

11

12

DENISE HUSKINS and AARON QUINN,          Case No. 2:16-cv-00603-TLN-EF

13            Plaintiffs,

14                                       **PLAINTIFFS' OPPOSITION TO
                                         DEFENDANTS' SPECIAL MOTION TO
15       v.                              STRIKE THE SECOND AND FIFTH
                                         CAUSES OF ACTION**
16  CITY OF VALLEJO, a public entity, KENNY
    PARK, MATHEW MUSTARD, and DOES 1-    Date: September 8, 2016
17  25,                                  Time: 2:00 p.m.
                                         Courtroom: 2, 15th Floor
18            Defendants.                Judge: Hon. Troy L. Nunley

19

20

21

22

23

24

25

26

27

28

KERR
&
WAGSTAFFE
LLP

**TABLE OF CONTENTS**

*Page*

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 2

       A.    Plaintiffs Lived Outside Of The Public Eye As Physical Therapists.................... 2

       B.    Plaintiffs Are Violently Assaulted And Huskins Is Kidnapped.......................... 2

       C.    VPD Ignores Key Evidence and Aggressively Interrogates Quinn .................... 3

       D.    Huskins Is Kidnapped, Transported Across The State In The Trunk Of A
             Car, And Raped Twice...................................................................................... 4

       E.    While She Was Still Missing, Mustard Accuses Huskins Of Trying To
             "Re-Live" The Thrill Of Prior Sexual Trauma .................................................. 4

       F.    Huskins Is Released In Huntington Beach, And VPD Accuses Her Of A
             Crime Before Taking Her Statement .................................................................. 5

       G.    VPD Publicly Smears Huskins And Quinn ........................................................ 6

       H.    VPD Continues To Attack Huskins And Quinn .................................................. 7

       I.    The FBI Arrests Matthew Muller For The Kidnapping........................................ 8

III.   THE ANTI-SLAPP STATUTE DOES NOT APPLY IN FEDERAL COURT .............. 8

IV.    ANALYSIS IF THE ANTI-SLAPP STATUE APPLIES ................................................. 8

       A.    Plaintiffs Can Establish A Probability Of Prevailing On Their Defamation
             Claim................................................................................................................. 9

             1.   Defendants' Conduct Is Not Privileged Under California Civil
                  Code Section 47(b) .............................................................................. 10

                  a)    Defendants' statements to the press are not statements
                        made in a judicial proceeding .................................................... 10

                  b)    Defendants' statements to the press were not made as part
                        of an "official proceeding"......................................................... 12

                  c)    Defendants statements outside of the press release are also
                        unprotected, and require discovery ............................................ 14

             2.   Defendants' Conduct Is Not Immunized Under California
                  Government Code Section 821.6 ........................................................... 14

             3.   The *New York Times* "Actual Malice" Standard Does Not Apply,
                  and Plaintiffs Have Readily Met that Standard Regardless .................... 16

i

KERR
&
WAGSTAFFE
LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

         a)     Plaintiffs were not public figures ................................................16

         b)     Even if "actual malice" were required, Plaintiffs have demonstrated such malice ...........................................................16

  B.     Plaintiff Huskins Can Establish A Probability Of Prevailing On Her Intentional Infliction of Emotional Distress Claim............................................ 20

V.     CONCLUSION.......................................................................................... 20

KERR
&
WAGSTAFFE
LLP

1

## <u>TABLE OF AUTHORITIES</u>

2

*Pages*

3

### <u>*Cases*</u>

4

*Abbas v. Foreign Policy Grp., LLC*,
5
    783 F.3d 1328 (D.C. Cir. 2015) ................................................................. 8

6
*Abuemeira v. Stephens*,
    246 Cal. App. 4th 1291 (2016) ............................................................... 9

7
*Antonovich v. Superior Court*,
8
    234 Cal. App. 3d 1041 (1991) ............................................................... 18

9
*Braun v. Bureau of State Audits*,
    67 Cal. App. 4th 1382 (1998) ............................................................... 12

10
*Brewster v. Cty. of Shasta*,
11
    112 F. Supp. 2d 1185 (E.D. Cal. 2000) ................................................ 15

12
*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993) ............................................................................. 13

13
*Dinius v. Perdock*,
14
    2012 WL 1925666 (N.D. Cal. May 24, 2012) ..................................... 15

15
*Forro Precision, Inc. v. Int'l Bus. Machines Corp.*,
    673 F.2d 1045 (9th Cir. 1982) ............................................................. 11

16
*Garmon v. Cty. of Los Angeles*,
17
    2016 WL 3606745 (9th Cir. July 5, 2016) ...................................... 15, 20

18
*GetFugu, Inc. v. Patton Boggs LLP*,
    220 Cal. App. 4th 141 (2013) ......................................................... 10, 11

19
*Hagberg v. California Fed. Bank FSB*,
20
    32 Cal. 4th 350 (2004) ......................................................................... 12

21
*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ............................................................................. 18

22
*Hawran v. Hixson*,
23
    209 Cal. App. 4th 256 (2012) ............................................................... 12

24
*Imig v. Ferrar*,
    70 Cal. App. 3d 48 (1977) ................................................................... 13

25
*Lefebvre v. Lefebvre*,
26
    199 Cal. App. 4th 696 (2011) ............................................................... 9

27
*Lorain Journal Co. v. Milkovich*,
    474 U.S. 953 (1985) ............................................................................. 16

28
*Luong v. City & Cty. of San Francisco*,
    2012 WL 5869561 (N.D. Cal. Nov. 19, 2012) ..................................... 15

KERR
&
WAGSTAFFE
LLP

*Makaeff v. Trump Univ., LLC,*
   736 F.3d 1180 (9th Cir. 2013) ............................................................................ 8

*Metabolife Int'l, Inc. v. Wornick,*
   264 F.3d 832 (9th Cir. 2001) ...................................................................... 9, 17

*Milstein v. Cooley,*
   257 F.3d 1004 (9th Cir. 2001) ............................................................................ 9

*Mindys Cosmetics, Inc. v. Dakar,*
   611 F.3d 590 (9th Cir. 2010) .............................................................................. 9

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ........................................................................................... 17

*Nguyen-Lam v. Cao,*
   171 Cal. App. 4th 858 (2009) ........................................................................... 17

*Palmer v. Zaklama,*
   109 Cal. App. 4th 1367 (2003) ........................................................................... 9

*Reader's Digest Assn. v. Superior Court,*
   37 Cal. 3d 244 (1984) ................................................................................. 16, 20

*Roberts v. McAfee, Inc.,*
   660 F.3d 1156 (9th Cir. 2011) ............................................................................ 9

*Rogers v. Home Shopping Network, Inc.,*
   57 F. Supp. 2d 973 (C.D. Cal. 1999) ............................................................ 9, 17

*Rothman v. Jackson,*
   49 Cal. App. 4th 1134 (1996) ........................................................... 10, 11, 14, 20

*Rusheen v. Cohen,*
   37 Cal. 4th 1048 (2006) ................................................................................... 13

*Silberg v. Anderson,*
   50 Cal.3d 205 (1990) ........................................................................................ 10

*Soliz v. Williams,*
   74 Cal. App. 4th 577 (1999) ............................................................................. 13

*Sullivan v. Cty. of Los Angeles,*
   12 Cal. 3d 710 (1974) ....................................................................................... 15

*Susan A. v. County of Sonoma,*
   2 Cal. App. 4th 88 (1991) ................................................................................. 10

*Tucker v. City of Richmond,*
   2012 WL 2571314 (N.D. Cal. July 2, 2012) ..................................................... 15

*Verizon Delaware, Inc. v. Covad Commc'ns Co.,*
   377 F.3d 1081 (9th Cir. 2004) ............................................................................ 9

*Williams v. City of Merced,*
   2013 WL 498854 (E.D. Cal. Feb. 7, 2013) ................................................. 15, 20

*Wolston v. Reader's Digest Ass'n, Inc.*,
   443 U.S. 157 (1979) ................................................................................................ 16

## *Statutes*

Cal. Civ. Code § 47(b) ........................................................................... 9, 10, 12, 20

Cal. Civ. Proc. Code § 425.16 ................................................................................. 8

Cal. Gov't Code § 815.2 ....................................................................................... 19

Cal. Gov't Code § 821.6 .................................................................................... 9, 14

## *Other Authorities*

Frank J. Menetrez, *Lawless Law Enforcement: The Judicial Invention of Absolute Immunity for Police and Prosecutors in California*,
   49 Santa Clara L. Rev. 393, 426 (2009) ............................................................... 15

## *Rules*

Fed. R. Civ P. 12 .................................................................................................... 8

Fed. R. Civ. P. 26 .................................................................................................... 9

Fed. R. Civ. P. 56 ............................................................................................ passim



# I.      INTRODUCTION

Plaintiffs Denise Huskins ("Huskins") and Aaron Quinn ("Quinn") were asleep in Quinn's home when an intruder broke in, tied them up, kidnapped Denise, and raped her multiple times before releasing her days later.  When both victims went to the Vallejo Police Department ("VPD") in their desperate hour of need, VPD not only did not help, it affirmatively waged a vicious campaign against them for the purpose of covering up their own incompetence.  Due to Defendants' bullying and utterly false fixation that Quinn must have murdered Huskins, they first illegally interrogated Quinn for 18 straight hours while Huskins was missing.  Then, when Huskins "inconveniently" showed up alive, Defendants hatched an even more outrageous scheme: to cover up their first false theory that Quinn killed Huskins by going on national television within hours of Huskins's release and falsely announcing that Huskins and Quinn had simply made the whole thing up.  Defendants now seek, via this anti-SLAPP motion, to strike Plaintiffs' defamation and intentional infliction of emotional distress ("IIED") claims, asserting that they acted within the bounds of the law.  Defendants' motion is meritless.

First, Defendants assert that they are absolutely immune under California Civil Code section 47(b) because their statements to the national media involved the same subject matter as an ongoing police investigation.  But, as explained in Plaintiffs' concurrently filed motion to dismiss and further below, law enforcement is not given free rein under 47(b) to abuse victims through press releases serving no investigative function simply because such conduct involves the same topics as a police investigation.  In addition, Plaintiffs have alleged in their Complaint that many additional statements were made outside the context of the statements to the press, for example in statements made to VPD's friends and neighbors, that served no investigative function.  Under the Federal Rules, Plaintiffs are entitled to discovery on these claims before this Motion can be resolved as to those statements.

Second, Defendants argue that Government Code section 821.6 bars the defamation and IIED claims.  But they ignore binding Ninth Circuit authority holding that this section applies *only* to claims for malicious prosecution, and not the claims Plaintiffs bring here.

Third, and most gallingly, Defendants allege that Plaintiffs are "public figures" for

1   purposes of defamation law simply because they had the unlucky misfortune to be the victims of

2   crimes that the media covered.  They thus argue that Plaintiffs must affirmatively demonstrate

3   that the statements were made with knowledge that they were false or with reckless disregard for

4   their falsity.  But Defendants ignore settled authority holding that Plaintiffs must *voluntarily*

5   thrust themselves in the limelight before this high showing of fault is required.  Further, even if

6   Plaintiffs were somehow considered public figures, Plaintiffs have more than enough evidence

7   demonstrating that Defendants made these false statements intentionally, and as part of a vicious

8   campaign to deflect public attention away from VPD's own ineptitude.  In any event, Defendants

9   are also entitled to discovery on these issues before the Court can rule on these matters.[1]

10  Accordingly, the Court should deny Defendants' anti-SLAPP motion in full.

11  **II.   BACKGROUND**

12      **A.   PLAINTIFFS LIVED OUTSIDE OF THE PUBLIC EYE AS PHYSICAL THERAPISTS**

13         At the time of the events giving rise to the Complaint, Plaintiffs were licensed physical

14  therapists living in Vallejo, California.  (Huskins Decl. ¶ 2; Quinn Decl. ¶ 2.)  Plaintiffs were

15  private citizens holding private employment with Kaiser Hospital.  (Huskins Decl. ¶ 2; Quinn

16  Decl. ¶ 2.)  At no time did Plaintiffs ever seek the public eye or take any steps to address any

17  issues of public concern.  (Huskins Decl. ¶ 2; Quinn Decl. ¶ 2.)

18      **B.   PLAINTIFFS ARE VIOLENTLY ASSAULTED AND HUSKINS IS KIDNAPPED**

19         On March 23, 2015, Plaintiffs were sleeping at Quinn's home when one or more

20  intruders[2] broke into the home, blindfolded Plaintiffs, bound their hands and feet, and drugged

21  them.  (Huskins Decl. ¶ 3; Quinn Decl. ¶ 3.)  The assailant instructed Quinn that Huskins would

22  be kidnapped for ransom, that Quinn was being monitored, and that the assailant would harm

23  Denise if Aaron went to the police.  (Quinn Decl. ¶ 4.)  The assailant followed through on his

24  

---

25  [1]    In accordance with this point, Plaintiffs have concurrently filed a Federal Rule of Civil

26  Procedure 56(d) declaration of James M. Wagstaffe for such discovery.

27  [2]    Plaintiffs believed that there were multiple people involved, although only one assailant

28  (Matthew Muller) is currently being prosecuted for the crime.  For ease of reference, Plaintiffs simply reference the "intruder" or "assailant" (singular).  (Huskins Decl. ¶ 3; Quinn Decl. ¶ 3.)



1   threats and took Denise.  (Huskins Decl. ¶ 4.)  Quinn, confined to the couch, ultimately

2   succumbed to sleep from effects of the strong sedative the intruder had given him.  (Quinn Decl.

3   ¶ 5.)  When he awoke hours later he was terrified and agonized for the next several hours about

4   what to do.  (*Id.* ¶ 6.)  He was afraid to leave the house or call the police for fear that the

5   kidnapper would harm Huskins.  In the intervening hours, he received a number of texts and

6   emails requesting a ransom for Huskins's release.  (*Id.* ¶ 5.)

7        C.    **VPD IGNORES KEY EVIDENCE AND AGGRESSIVELY INTERROGATES QUINN**

8             Quinn called VPD, who came to his home.  (*Id.* ¶ 6.)  The police immediately acted as if

9   Quinn was the criminal rather than the victim, focused solely on irrelevant evidence they thought

10  might implicate him (such as whether he had held a "party" the night before), and ignored key

11  evidence of the crime (such as evidence of forced entry to the house and batteries and other items

12  left by the true kidnapper).  (*Id.* ¶ 7.)  Quinn went with officers to the VPD station, where he was

13  promptly and maliciously treated like Huskins's murderer.  (*Id.*)  VPD took Quinn's clothing.

14  (*Id.* ¶ 8.)  In exchange, Quinn was given prison pants with the words "Solano Prison" displayed

15  on the side and a dirty white t-shirt, but no underwear or socks.  (*Id.*)  They also took his blood

16  and DNA.  (*Id.*)  The police placed Quinn in an interrogation room, where he was cut off from

17  any family or other visitors who would be able to help him.  (*Id.*)  VPD proceeded to interrogate

18  Quinn aggressively for 18 straight hours.  (*Id.* ¶ 9.)  Det. Mustard and others repeatedly told

19  Quinn they believed he was lying, that they did not want to hear about any claimed intruders, and

20  that they knew that Quinn had killed Huskins.  (*Id.*)  VPD led Quinn to believe that he was not

21  free to leave during the marathon interrogation.  (*Id.* ¶ 10.)  Despite VPD's aggressive posturing,

22  VPD did not have any evidence to charge Quinn with any crime, and he was released after his

23  attorney arrived.  (*Id.* ¶¶ 10-15.)  VPD delayed Quinn's departure in an apparent attempt to

24  secure more media coverage of Quinn's release.  When VPD finally allowed Quinn to leave,

25  they tried to force Quinn—sleep deprived, hungry, and still wearing the jail clothes from VPD—

26  to exit the front of the station where numerous media outlets had congregated at VPD's

27  instruction.  (*Id.* ¶ 16.)  Quinn's attorneys identified what was occurring, and secured a more

28  discrete release.  (*Id.*)

KERR
—— & ——
WAGSTAFFE
LLP

After his release, Quinn discovered that, rather than monitoring his email and phone for communications from the kidnapper, VPD instead put his plane on airplane mode, and thus missed several emails and calls.  (*Id.* ¶¶ 17-18.)  Quinn shared these new communications with VPD, which had all occurred while he was in custody.  (*Id.*)  Over the next two days, Quinn continued to cooperate with VPD.  (*Id.* ¶ 19.)

### D.   HUSKINS IS KIDNAPPED, TRANSPORTED ACROSS THE STATE IN THE TRUNK OF A CAR, AND RAPED TWICE

When initially taken from Quinn's house, Huskins was transported several hours away in the trunk of a car by the kidnapper.  (Huskins Decl. ¶ 4.)  Huskins was taken into the bedroom of a home and tied to the bed with zip ties and a bike lock.  (*Id.* ¶ 5.)  For the next day, Huskins remained a hostage in this small room, and was forced to wear a blindfold made of blacked out swim goggles when her captor entered the room.  (*Id.*)  Huskins was drugged repeatedly while held captive, and raped multiple times.  (*Id.*)  The kidnapper threatened that he would harm Huskins and/or her family again if she disclosed the rapes or the kidnapper's supposed military background when she spoke with the police or media.  (*Id.* ¶ 7.)  Huskins was again drugged and blindfolded, as the kidnapper drove for hours.  (*Id.*)

### E.   WHILE SHE WAS STILL MISSING, MUSTARD ACCUSES HUSKINS OF TRYING TO "RE-LIVE" THE THRILL OF PRIOR SEXUAL TRAUMA

While held captive, the kidnapper forced Huskins to record a "proof of life" tape, used by kidnappers asking for ransom to prove that the kidnapped person is still alive.  (*Id.* ¶ 6.)  Shortly thereafter, VPD had Huskins's mother and brother verify that her voice was the voice in the recording.  (*See* Jane Huskins Dec. ¶ 3.)  During that encounter, VPD officers said that Huskins's mother should watch the movie "Gone Girl" to understand what was happening to her daughter. [3] (*Id.* ¶ 11.)  They also asked Huskins's mother if Huskins had ever been kidnapped or assaulted before.  (*Id.* ¶ 6.)  Huskins's mother confided that Huskins had been sexually molested when she was a child.  (*Id.*)  An officer, believed to be Defendant Mustard, stated that the fact Huskins had

---

[3]   "Gone Girl" is a fictitious book-turned-to-film about a cheating husband accused of killing his wife.  A final twist reveals that, rather than being kidnapped, the wife elaborately faked her disappearance to frame the husband as revenge for his infidelity.

previously been sexually abused made sense because, in his experience, women who have already been sexually assaulted often pretend that it is happening again in order to gain attention and "re-live" the excitement of that experience. (*Id.* ¶ 13.) He explained that it is likely that Huskins was just making this whole incident up to get attention. (*Id.*)

### F.   HUSKINS IS RELEASED IN HUNTINGTON BEACH, AND VPD ACCUSES HER OF A CRIME BEFORE TAKING HER STATEMENT

On March 25, 2015, Huskins was released near her parents' homes in Huntington Beach. (Huskins Decl. ¶ 8.) The Huntington Beach Police Department ("HBPD") observed "darker impression circles" around her eyes, consistent with Huskins's and Quinn's statements that they had been forced to wear swim goggles as blindfolds. (Clune Decl. Ex. A, p.7.) Huskins also showed HBPD the shoes—which were too large for her feet—and water bottle the kidnapper had given her. (*Id.* at p.6; Huskins Decl. ¶ 13.) Huskins spoke with HBPD for nearly one hour about her kidnapping and release. (Huskins Decl. ¶ 12.) Still in shock from the kidnapping and fearful of retribution from a dangerous criminal still on the run, Huskins denied to HBPD that she had twice been sexually assaulted and did not mention that the kidnapper claimed to be ex-military. (*Id.* ¶ 14.) Huskins's account regarding the details of the home invasion entirely corroborated Quinn's. (*See Id.* ¶ 3; Quinn Decl. ¶ 3.)

HBPD contacted VPD, and spoke with them for approximately one-half hour. (Huskins Decl. ¶15.) Although VPD had neither seen nor spoken with Huskins, Det. Mustard spoke with HBPD about the case, and ultimately spoke with Huskins's cousin who was on the scene. (*Id.*; Nicholas Huskins Decl. ¶ 11.) VPD's only contact with Huskins—through Det. Mustard's call with Huskins's cousin—did not check on Huskins's condition or follow up on her story to catch the dangerous predator that had just released her. (*See* Nicholas Huskins Decl. ¶¶ 11, 14.) Instead, Det. Mustard threatened and verbally attacked Huskins. (*Id.*) Det. Mustard told Huskins's cousin that VPD was offering a "proffer of agreement." (*Id.*) Det. Mustard stated that Quinn had been at the station cooperating with VPD, and whoever accepted first would get immunity. (*Id.*) Det. Mustard told Huskins's cousin, "I don't want to hear any more about these 'frog men,'" or words to that effect, and demanded that she get on a small police jet back to

1  Vallejo.  (*Id.*)  Det. Mustard was hostile and aggressive during this call.  (*Id.*)  Given that

2  Huskins had "inconveniently" shown up alive, VPD maliciously transitioned to the hoax story to

3  avoid criticism for its initial and utterly baseless accusations of murder.  (Compl. ¶ 51.)

4  Detective Mustard made similar statements to Quinn and Huskins's mother.  (Quinn Decl. 21;

5  Jane Huskins Decl. ¶¶ 20-22.)

6      Huskins learned about VPD's prior assertions that Quinn murdered Huskins and its new

7  assertions that both Huskins and Quinn had faked the entire story.  (Huskins Decl. ¶ 20.)  Fearful

8  that VPD would place her back in a confined area and subject her to additional trauma, and that

9  she was unjustly being painted as a suspect in a crime rather than as the victim that she truly was,

10  Huskins took a commercial flight back to the Bay Area.  (*Id.*)  Huskins travelled alone with a

11  borrowed cell phone, cowering wherever she could to avoid the press, police, or kidnapper, each

12  of which she reasonably believed were still after her.  (*Id.*)

13      **G.    VPD PUBLICLY SMEARS HUSKINS AND QUINN**

14      Even before Huskins's plane touched down in the Bay Area, VPD began a dramatic

15  public relations assault on her and Quinn.  First, VPD issued a press release to the public, stating

16  in part: "Today, there is no evidence to support the claims that this was a stranger abduction or

17  an abduction at all. Given the facts that have been presented thus far, this event appears to be an

18  orchestrated event and not a kidnapping."  (Clune Decl. Ex. B.)

19      At a press conference held that same evening at approximately 9:27 p.m., Lt. Park made

20  the following statements, each of which were false:

21      o   "We also know that the statement that Mr. Quinn provided was such an incredible
22          story, we initially had a hard time believing it, and, upon further investigation, *we
            were not able to substantiate any of the things that he was saying*."

23      o   "*Mr. Quinn and Ms. Huskins has plundered valuable resources away from our
24          community, and has taken the focus away from the true victims of our community*,
            while instilling fear amongst our community members.  So, if anything, it is *Mr.
25          Quinn and Ms. Huskins* that *owes this community an apology*."

26      o   "If you can imagine devoting all of our resources, 24 hours a day, *on what I will – uh
27          - classify as a wild goose chase* – it's a tremendous loss.  It's disappointing, it's
            disheartening, and *the fact that we've essentially wasted all of these resources, for
            essentially nothing, is upsetting*."

28

KERR
&
WAGSTAFFE
LLP

6

Case No. 2:16-cv-00603-TLN-EF          PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE

o    Question: "Is there any evidence that makes you know, conclusively, that this was a fake?  I mean, did something come up that made it without argument that this was all a hoax?"

Lt. Park: "*I can tell you that our investigation has concluded that none of the claims has been substantiated.  I can go one step further to say this – that this was not a random act, and that the members of our community are safe, and that they have nothing to fear.*"

(Clune Decl. Ex. C; *see* Nicholas Huskins Decl. ¶ 19.)  Each statement was undeniably false and despicable.  Lt. Park and VPD surely knew that it is a crime to provide false statements to the police, and indicated that Huskins and Quinn had committed that crime.  In fact, VPD and Lt. Park had no evidence to support the false and disparaging comments made so publicly.  Within minutes of VPD's false statements that Huskins's kidnapping was a hoax, VPD had successfully and widely turned a local disappearance into a worldwide media frenzy proliferating VPD's public smearing of Huskins and Quinn.  News outlets across the world likened Huskins to the lead character in the film "Gone Girl," and placed Huskins's picture next to that of the lead character, including one depicting the character naked and covered in blood.  (Clune Decl. Ex. D.)  Nancy Grace took to television displaying the Twitter hashtag "#kidnappinghoax."  (*Id.* Ex. E.)

On information and belief, VPD gratuitously made numerous additional false and otherwise defamatory statements about Huskins and Quinn to others without any valid law enforcement purpose.  (Compl. ¶ 47.)

**H.    VPD CONTINUES TO ATTACK HUSKINS AND QUINN**

Shortly after Huskins landed in San Francisco, Huskins's attorney told VPD that she would continue cooperate with the investigation into her kidnapping.  (Huskins Decl. ¶ 25.)  Huskins's attorney also told VPD that Huskins wished to submit to a sexual assault exam as soon as possible.  (*Id* ¶ 26.)  VPD demeaned the exam request and told her attorney that it could wait.  (*Id.*)

Huskins ultimately spoke with VPD for nearly two full days about her captivity and sexual assaults.  (Huskins Decl. ¶ 27.)  Nothing Huskins said provided any additional justification to Defendants' defamatory statements, yet VPD focused intently on proving up its

1   "Gone Girl" case.  Investigators repeatedly told Huskins and her attorneys that she was lying,

2   and built up a deceptive evidentiary record in hopes that they could charge her with a crime.

3   (*Id.*)  Due to the ongoing and aggressive harassment of Huskins, Quinn, and those connected to

4   them by VPD, Huskins and Quinn no longer feel safe in the City of Vallejo; VPD's actions have

5   forced Huskins and Quinn to leave the City of Vallejo.  (Huskins Decl. ¶ 28; Quinn Decl. ¶ 25.)

6        **I.**     **THE FBI ARRESTS MATTHEW MULLER FOR THE KIDNAPPING**

7        In June 2015, Matthew Muller was arrested in connection with a similar invasion and

8   assault.  On July 13, 2015, an unsealed FBI affidavit detailed Muller's purported involvement in

9   Huskins's kidnapping.  (Dkt. No. 1 in Case No. 2:15-cr-00205-TLN.)  The 50-page affidavit

10  mirrored the accounts of Plaintiffs and directly contradicts both VPD's public statements and the

11  declarations in support of Defendants' motion.  On July 20, 2015, the City of Vallejo admitted

12  privately that "it is clear now that there was a kidnapping on March 23, 2015, that it was not a

13  hoax or orchestrated event and that VPD conclusions were incorrect."  (Huskins Decl. Ex. A;

14  Quinn Decl. Ex. B.)  Even then, VPD still maintained that it had done nothing wrong given "the

15  information that was available at the time."  (*Id.*)  In the meantime, Huskins and Quinn's lives

16  and reputations were completely destroyed.

17  **III.**     **THE ANTI-SLAPP STATUTE DOES NOT APPLY IN FEDERAL COURT**

18       California Code of Civil Procedure section 425.16 is a procedural rule that conflicts with

19  Federal Rules of Civil Procedure 12 and 56.  Rules 12 and 56 "establish the exclusive criteria for

20  testing the legal and factual sufficiency of a claim in federal court."  *Makaeff v. Trump Univ.,*

21  *LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing en

22  banc); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015).  Plaintiffs

23  recognize that existing Ninth Circuit authority currently holds otherwise, and make this argument

24  to preserve this issue for appeal.

25  **IV.**     **ANALYSIS IF THE ANTI-SLAPP STATUE APPLIES**

26       "The anti-SLAPP statute requires a two-part analysis: (1) the defendant must make a

27  prima facie showing that the suit arises 'from an act in furtherance of the defendant's rights of

28  petition or free speech'; and (2) once the defendant makes this showing, 'the burden shifts to the

KERR
—— & ——
WAGSTAFFE
LLP

8

plaintiff to demonstrate a probability of prevailing on the challenged claims.'"  *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1163 (9th Cir. 2011) (quoting *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010)).  On disputed issues of fact, prong two of the anti-SLAPP analysis is considered under the same standard as a Rule 56 motion for summary judgment. *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 981-82 (C.D. Cal. 1999).  Thus, as with summary judgment, all inferences on disputed facts must be drawn in Plaintiffs' favor. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001).  Further, leave to amend should be liberally allowed even if the anti-SLAPP motion is granted.  *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).

### A.  PLAINTIFFS CAN ESTABLISH A PROBABILITY OF PREVAILING ON THEIR DEFAMATION CLAIM

Plaintiffs do not dispute that the defamation claim arises from an act in furtherance of the rights of petition or free speech under prong one of the anti-SLAPP statute. [4]  As to prong two, Defendants do not argue that the statements giving rise to Plaintiffs' claims were true.  Instead, Defendants ask this Court to hold each statement privileged under California Civil Code section 47(b) or California Government Code section 821.6, or, alternatively, that Plaintiffs are "public figures" and Defendants acted without actual malice.  Defendants bear the burden of demonstrating the applicability of any privileges or immunities.  *Milstein v. Cooley*, 257 F.3d 1004, 1008 (9th Cir. 2001); *Palmer v. Zaklama*, 109 Cal. App. 4th 1367, 1380 (2003).  None of Defendants' arguments are availing.

---

[4]  Plaintiffs have not been given documents, including emails and texts, from VPD despite a full public records request and Defendants' obligation to provide documents under Fed. R. Civ. P. 26.  As such, Plaintiffs concurrently have filed a Fed. R. Civ. P. 56(d) request for such discovery.  (*See* Wagstaffe Decl.)  It is reasonably anticipated that such discovery will show even more deceit and unlawful involvement by VPD in this investigation and communications that are well beyond any pending or anticipated proceeding, in which case the anti-SLAPP statute could not properly be invoked at all.  *See Abuemeira v. Stephens*, 246 Cal. App. 4th 1291, 1298 (2016); *Lefebvre v. Lefebvre*, 199 Cal. App. 4th 696, 703 (2011).

1

**1.  Defendants' Conduct Is Not Privileged Under California Civil Code Section 47(b)**

2

3

*a)  Defendants' statements to the press are not statements made in a judicial proceeding*

4

Defendant argues that their statements to the press are protected as part of a "judicial

5

proceeding" under section 47(b)(2).  (Mot. at 10.)  But a press conference is not a judicial

6

proceeding, and California courts have routinely held that statements made to the general public

7

about judicial proceedings are not protected under section 47(b)(2).  "The principal purpose of

8

the litigation privilege 'is to afford litigants and witnesses the utmost freedom of access to the

9

courts without fear of being harassed subsequently by derivative tort actions.'"  *GetFugu, Inc. v.*

10

*Patton Boggs LLP*, 220 Cal. App. 4th 141, 152 (2013) (citation omitted).  The litigation privilege

11

"applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants

12

or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that

13

have some connection or logical relation to the action."  *Id.* (citation omitted).

14

For the privilege to apply, there must be a "*functional* connection" to the litigation itself.

15

*Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1141 (1996).  Thus, for example, statements made

16

in pleadings and demand letters, are protected as logically related to the judicial proceedings.  *Id.*

17

at 1148 (collecting cases).  But press conferences explaining one party's position on potential or

18

actual litigation to the general public are not protected.  *Id.* at 1148-49 (involving a press

19

conference in response to potential criminal and civil tort allegations of child abuse); *see also*

20

*Susan A. v. County of Sonoma*, 2 Cal. App. 4th 88, 93 (1991) (after a public defender retained a

21

psychologist to interview a criminal defendant, subsequent statements by that psychologist to the

22

press about what she learned in that interview were not privileged); *GetFugu, Inc.*, 220 Cal. App.

23

4th at 152 (involving statements made in a press release by attorneys for a company about an

24

FBI investigation into an adversary).  That is because "republications to nonparticipants in the

25

action are generally not privileged under section [47(b)] . . . ."  *Silberg*, 50 Cal. 3d at 219.  Here,

26

Defendants' statements in the March 25, 2015 press conference and in related press releases

27

were not distributed to participants or witnesses in the litigation—they were sent broadly to the

28

national news media at large.  As such, they are not protected under section 47(b).

KERR
—— & ——
WAGSTAFFE
LLP

10

1    Defendants point to authority suggesting that statements made *to police* are protected by

2    the privilege because they can *prompt* and facilitate investigations that are prerequisites to

3    criminal prosecution.  (Mot. at 10:17-22 (citing *Forro Precision, Inc. v. Int'l Bus. Machines*

4    *Corp.*, 673 F.2d 1045, 1055 (9th Cir. 1982).)  But the press release and later statements to the

5    media here clearly did not have the function of *investigating* Huskins and Quinn, nor were they

6    communications directed at other law enforcement agencies aimed to *prompt* further

7    investigation of them.  Instead, they were extraneous statements made to the public at large,

8    which were separate and apart from the actual investigation.  Indeed, the actual substance of the

9    communications indicated that, as far as the police were concerned, there was no kidnapper and

10   thus no need for further investigation of the supposedly invented crime.  (*See, e.g.*, Compl. ¶ 89

11   ("I can tell you that *our investigation has concluded* that none of the claims has been

12   substantiated. I can go one step further to say this – that this was not a random act, and that *the*

13   *members of our community are safe, and that they have nothing to fear*.").)  As such, there is no

14   sense in which these press communications by the police furthered the investigation itself, much

15   less performed a function that was a prerequisite to any criminal prosecution.  Thus, they are not

16   protected.  *See Rothman*, 49 Cal. App. 4th at 1141.

17   Defendants may try and argue that the public had a "substantial interest" in the potential

18   criminal case given the threat to public safety posed by the a kidnapper being on the loose, and

19   therefore may contend that the statements should still be protected by section 47(b)(2), pointing

20   to certain case law including within the privilege's protections certain nonparties with a

21   "substantial interest" in the proceeding.  But, any such construction of the privilege that would

22   extend it to statements made to the general public on issues of "public interest" has been

23   repeatedly rejected by California courts because that "would swallow up the general rule, which

24   [the California Supreme Court ... reaffirmed, that [the litigation privilege] does not privilege

25   'republications to nonparticipants in the action . . .'"  *GetFugu, Inc.*, 220 Cal. App. 4th at 153

26   (citations omitted).  Thus, the general public cannot be said to be anything close to a

27   "participant" in the proceedings and Defendants' statements to the public via the press are not

28   part of a "judicial proceeding" under section 47(b)(2).

KERR
——&——
WAGSTAFFE
LLP

11

1

*b)   Defendants' statements to the press were not made as part of an "official proceeding"*

2

3    Defendants also argue that anything a police officer does in any way related to an

4    investigation *necessarily* constitutes an "official proceeding" authorized by law under section

5    47(b)(3), and therefore *any communication* about the investigation is *absolutely* privileged by

     law as long as it happened to be uttered by a police officer.  (Mot. at 10:8-14.)  No case law

6    supports Defendants' sweeping view of this privilege.

7    California courts have relied almost exclusively on the same authority applicable to

8    "judicial proceedings" under section 47(b)(2) (discussed above) in developing the case law

9    applicable to "official proceedings" under section 47(b)(3).  In so doing, they have reasoned

10   "*[b]y analogy to* cases extending the litigation privilege to statements made outside the

11   courtroom."  *Hagberg v. California Fed. Bank FSB*, 32 Cal. 4th 350, 362 (2004).  But nothing

12   suggests that the "official proceeding" privilege should somehow extend *beyond* what the

13   judicial proceeding privilege itself would cover to protect communications whose function is

14   *neither* to investigate nor to prompt officials to investigate.  [T]he communication must still be

15   'in furtherance of the objects' of the proceeding"—namely the *investigation—*and "not be

16   extraneous to the [proceeding]."  *Hawran v. Hixson*, 209 Cal. App. 4th 256, 282–83 (2012)

17   (alteration in original) (suggesting but not deciding that a statement made in a press release about

18   an SEC investigation was not protected by the "official proceeding" privilege because it did not

19   further the purposes of the SEC investigation.").

20   As explained above, Defendants' statements to the press on March 25, 2015 in no way

21   performed the function of investigating Huskins and Quinn, nor was their function to prompt any

22   investigation by others.  Instead, they were wholly "extraneous" statements made to the public at

23   large, separate and apart from the actual investigation and are thus not protected.

24   None of the cases that Defendants cite in their brief state otherwise.  For example, *Braun*

25   *v. Bureau of State Audits* concerned statements contained in a final audit report that the state

26   auditor was required by law to create and report to "official administrative agencies."  67 Cal.

27   App. 4th 1382, 1390 (1998).  Unsurprisingly, the Court held that statements made in the report

28

1    itself were entirely privileged.  Likewise, *Imig v. Ferrar* merely restates the rule that

2    communications serving to prompt an internal affairs investigation are privileged.  70 Cal. App.

3    3d 48, 55 (1977).  Here, unlike *Braun* and *Imig*, the statements to the press were in no way made

4    as part of an investigative report; indeed, they served no investigative function whatsoever.

5           Finally, it is important to put Defendants' sweeping interpretation of the privilege in

6    context to show how out of touch it is with the common law immunities on which the privilege is

7    based.  "The privilege recognized in section 47 derives from common law principles establishing

8    a defense to the tort of defamation."  *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006).  Under

9    that common law, "while prosecutors, like all attorneys, were entitled to absolute immunity from

10   defamation liability for statements made during the course of judicial proceedings and relevant to

11   them, most statements made out of court received only good-faith immunity"—not absolute

12   immunity irrespective of malice.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 277 (1993) (citations

13   omitted).  From this, the Supreme Court has held that the absolute protections of the litigation

14   privilege cannot possibly apply to statements to the press, even if made by prosecutors:

15          Comments to the media have no functional tie to the judicial process just because
            they are made by a prosecutor. . . . The conduct of a press conference does not
16          involve the initiation of a prosecution, the presentation of the state's case in court,
            or actions preparatory for these functions. Statements to the press may be an
17          integral part of a prosecutor's job . . . and they may serve a vital public function.
            But in these respects a prosecutor is in no different position than other executive
18          officials who deal with the press, and, as noted above qualified immunity is the
            norm for them.
19
     *Id.* at 277-78 (cross reference omitted); *see also Soliz v. Williams*, 74 Cal. App. 4th 577, 590-91,
20
     595 (1999) (discussing section 47(b) and the common law judicial immunity, and holding that
21
     "the absolute judicial immunity against the imposition of monetary damages does not extend to
22
     defamatory statements made by a judge to a reporter").  So too here, it would be completely
23
     inconsistent with the common law underpinnings of section 47(b) to hold that *police officers*—
24
     who are even further removed from courtroom proceedings—are somehow entitled to *absolute*
25
     immunity for anything they say in any way touching on an investigation simply because those
26
     statements happened to have been uttered by a police officer.  That would immunize knowingly
27
     false statements made to satisfy personal vendettas, even if the communication was solely made
28

1   to gratuitously injure an innocent victim.  Such an interpretation cannot be squared with the

2   public balancing of interests the privilege was designed to maintain.  *See Rothman*, 49 Cal. App.

3   4th at 1147 (holding that the "balancing of interests . . . disfavors application of the litigation

4   privilege to spiteful and harmful slurs made outside of the precincts which the privilege exists to

5   shelter").  Thus, Defendants' expansive interpretation of section 47(b)(3) privilege to cover

6   anything said about a police investigation by a police officer must be rejected.

7                   *c)  Defendants statements outside of the press release are also*
                    *unprotected, and require discovery*
8

9          Defendants' motion ignores Plaintiff's allegations that Defendants made additional

10  gratuitous statements about Plaintiffs over and above what they said in the press conference as

11  part of their intentional campaign of disparagement to deflect attention away from Vallejo's own

12  incompetence.  (Compl. ¶¶ 47, 86.)  Thus, for example, if Defendants made statements to their

13  friends, relatives, neighbors, or other non-witnesses repeating the same malicious and untruthful

14  statements, such communications can in no way be said to have been made as part of a "judicial

15  proceeding" or other "official proceeding," for all the reasons discussed above.  As such, there is

16  no conceivable immunity for these additional statements.

17         In addition, Defendants have refused Plaintiffs' attempts to obtain discovery about these

18  key issues.  As explained in Plaintiffs' concurrently filed Rule 56(d) declaration of James

19  Wagstaffe, this anti-SLAPP motion cannot be adjudicated as a matter of due process until such

20  discovery is obtained.

21              **2.   Defendants' Conduct Is Not Immunized Under California**
                **Government Code Section 821.6**

22         Under binding Ninth Circuit precedent, California Government Code section 821.6 does

23  not immunize Defendants' conduct against claims of defamation.  Section 821.6 states that "[a]

24  public employee is not liable for injury caused by his *instituting* or *prosecuting* any judicial or

25  administrative proceeding within the scope of his employment, even if he acts maliciously and

26  without probable cause."  Cal. Gov't Code § 821.6 (emphasis added).  The Ninth Circuit has

27  recently held that this statute applies *only* to claims for malicious prosecution against public

28  employees, but not other tort claims.  *Garmon v. Cty. of Los Angeles*, No. 12-55109, _ F.3d _,

1   2016 WL 3606745, at *7 (9th Cir. July 5, 2016).  In so doing, the Ninth Circuit followed

2   authority directly from the California Supreme Court, "'confining [section 821.6's] reach to

3   malicious prosecution actions'"  *Id.* (quoting *Sullivan v. Cty. of Los Angeles*, 12 Cal. 3d 710, 720

4   (1974)).  As other courts have noted, limiting 821.6 to malicious prosecution claims (and thus

5   not allowing it to immunize any action that happens to be part of a police investigation) is

6   necessary as a matter of public policy.  That is because "interpreting Section 821.6 to apply to all

7   tort claims would create 'a regime of lawless law enforcement in California' by giving the

8   'state's law enforcement authorities a license to kill or to do any other damage that strikes their

9   fancy, even maliciously and without probable cause, as long as they do it in the course of

10  investigating crime.'"  *Dinius v. Perdock*, No. C 10-3498 MEJ, 2012 WL 1925666, at *9 (N.D.

11  Cal. May 24, 2012) (quoting Frank J. Menetrez, *Lawless Law Enforcement: The Judicial*

12  *Invention of Absolute Immunity for Police and Prosecutors in California,* 49 Santa Clara L. Rev.

13  393, 426 (2009) (extensively analyzing legislative history of section 821.6).[5]

14          While it is true that some decisions from California's lower courts had previously

15  reached a different conclusion, and read section 821.6 much more expansively, the Ninth Circuit

16  expressly rejected these decisions as misguided and inconsistent with California Supreme Court

17  precedent, and the statute's legislative history.  *Garmon*, 2016 WL 3606745, at *7.  Defendants'

18  only cite to the same California Court of Appeals cases that the Ninth Circuit rejected.  (*See* Mot.

19  at 11:10-16.)  This Court is bound to follow the Ninth Circuit on matters of state law, even if it

20  conflicts with lower California courts of appeals.  *See Brewster v. Cty. of Shasta*, 112 F. Supp. 2d

21  1185, 1188 & n.5 (E.D. Cal. 2000), *aff'd*, 275 F.3d 803 (9th Cir. 2001).

22          Here, Plaintiffs plainly do not bring a claim for malicious prosecution.  Instead, Plaintiffs

23  brought a state tort claims for defamation.  The Ninth Circuit makes clear that section 821.6 does

24

---

25  [5]        Numerous other federal district court decisions had previously reached the same
26  conclusion.  *See*, *e.g.*, *Williams v. City of Merced*, No. 1:10-CV-01999-MJS, 2013 WL 498854,
    at *17 (E.D. Cal. Feb. 7, 2013); *Tucker v. City of Richmond*, No. C 12-1829 MEJ, 2012 WL
27  2571314, at *5 (N.D. Cal. July 2, 2012); *Myers v. City & Cty. of San Francisco*, No. C 08-1163
    MEJ, 2012 WL 4111912, at *7 (N.D. Cal. Sept. 18, 2012); *Luong v. City & Cty. of San*
28  *Francisco*, No. C11-5661 MEJ, 2012 WL 5869561, at *8 (N.D. Cal. Nov. 19, 2012).



KERR
&
WAGSTAFFE
LLP

Case No. 2:16-cv-00603-TLN-EF                           PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE

1   not immunize Defendants' conduct in this regard.

2       **3.   The *New York Times* "Actual Malice" Standard Does Not Apply,**
        **and Plaintiffs Have Readily Met that Standard Regardless**

3       Defendants argue both that the "actual" malice standard applies to Plaintiffs' defamation

4   claims and that there is insufficient evidence to meet that standard.  Neither argument has merit.

5                        *a)  Plaintiffs were not public figures*

6       Plaintiffs did not voluntarily participate, in any way, in the controversy giving rise to

7   Defendants' coordinated disparagement campaign, and therefore Plaintiffs are not public figures.

8   "[A] 'public figure' plaintiff must have undertaken some *voluntary* act through which he seeks to

9   influence the resolution of the public issues involved."  *Reader's Digest Assn. v. Superior Court*,

10  37 Cal. 3d 244, 254 (1984) (emphasis in original); *Wolston v. Reader's Digest Ass'n, Inc.*, 443

11  U.S. 157, 167 (1979) ("A private individual is not automatically transformed into a public figure

12  just by becoming involved in or associated with a matter that attracts public attention.").  "To

13  hold otherwise would create an 'open season' for all who sought to defame persons convicted of

14  a crime." *Wolston*, 443 U.S. 157 at 169.  Defendants only citation in support of this argument is

15  to a dissent to a denial of a petition for certiorari.  *See Lorain Journal Co. v. Milkovich*, 474 U.S.

16  953, 964 (1985).  But even the *Lorain Journal Co.* dissent recognized that "a court must focus on

17  the 'nature and extent of an individual's participation in the particular controversy giving rise to

18  the defamation.'" *Id.* at  963 n.8 (quoting *Wolston*, 443 U.S. at 167).  Defendants offer no facts

19  or legal reason that Plaintiffs are public figures.  At all times, Plaintiffs were private citizens,

20  living life outside of the public eye.  (Huskins  Decl. 2; Quinn Decl. ¶ 2.)  Prior to the defamatory

21  statements at issue, Plaintiffs took no voluntary steps to inject themselves in the action.  To the

22  contrary, Plaintiffs were unwilling victims of a terrifying assault and kidnapping, which

23  Defendants exacerbated when they maliciously defamed Plaintiffs in front of the international

24  news media.

25                *b)  Even if "actual malice" were required, Plaintiffs have*
                *demonstrated such malice*

26

27      Plaintiffs have offered sufficient evidence from which a reasonable jury could conclude

28  that Defendants acted with actual malice while engaging in their deliberate campaign of

1    disparagement.  Because this is a *factual* question, this motion is treated analogous to a Rule 56

2    motion for summary judgment, and all facts must be viewed in the light most favorable to

3    Plaintiffs.  *Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 981 (C.D. Cal. 1999);

4    *see also Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001).  Thus, the motion

5    can only be granted if no reasonable juror could find for Plaintiffs.  *Metabolife*, 264 F.3d at 840.

6        "To show actual malice, a public figure must demonstrate the defendant uttered the

7    statement 'with knowledge that it was false or with reckless disregard of whether it was false or

8    not.'"  *Nguyen-Lam v. Cao*, 171 Cal. App. 4th 858, 867 (2009) (quoting *New York Times Co. v.*

9    *Sullivan*, 376 U.S. 254, 278–79 (1964)).  Here, there is more than enough evidence from which a

10   reasonable juror could infer that Defendants made the statements knowing they were false as part

11   of a coordinated campaign to cover up VPD's failed investigation.  For example, Det. Mustard's

12   absurd statement that *rape victims like to "re-live" their sexual assault*, and therefore Huskins

13   (and Quinn) must be recreating that horrid experience by fabricating an abduction story is so

14   unbelievable, that it suggests a deeper motivation for VPD's campaign of disparagement here.

15   (*See* Jane Huskins Decl. ¶ 13.)  Similarly absurd was Det. Mustard's wild assertion—made at a

16   time when Denise was still missing—that this case was a situation like "Gone Girl," where a

17   woman had faked her own disappearance and rape.  (*Id* ¶ 11.)  Moreover, the suggestion by

18   another detective, also made while Huskins was still missing, that he could tell Huskins's mother

19   what had happened in five year's time—after any statute of limitations would run—likewise is

20   suggestive of an intentional conspiracy to conceal and misrepresent the truth.  (*Id* ¶ 16.)

21       Further, Defendants have flat out lied in their declarations to the Court in the briefing on

22   this motion, again raising an inference of an intentional and continuing effort at falsification and

23   cover-up.  All three Declarations submitted by Defendants say that Huskins refused to speak to

24   the Huntington Beach Police Department.  (Mustard Decl. ¶ 18, O'Connel Decl. ¶ 6. Park Decl. ¶

25   12.)  But, as both Denise's testimony and the Huntington Beach Police Report itself demonstrate,

26   Denise did speak with HBPD for an hour or more, and was entirely cooperative.  (Clune Decl.

27   Ex. A; Huskins Decl. ¶ 12.)  Defendants' statements to the contrary suggest an ongoing

28   campaign of disparagement to save their own reputations at the expense of those of Quinn and

KERR
—&—
WAGSTAFFE
LLP

1    Huskins.

2          At the very least, there is sufficient evidence from which a reasonable jury could find that

3    Defendants intentional avoidance of facts that might contradict their absurd "Gone Girl theories"

4    was reckless, which is all that is required to demonstrate constitutional malice.  A failure to

5    investigate may evidence actual malice where that failure "was a product of a deliberate decision

6    not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges

7    . . . ."  *Antonovich v. Superior Court*, 234 Cal. App. 3d 1041, 1048 (1991) (quoting *Harte-Hanks*

8    *Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)).  Here, VPD officers, including

9    Mustard, Park, and O'Connell, intentionally ignored reams of evidence that was inconsistent

10   with their fabricated story, while supposedly crediting wholly absurd theories.  In addition to the

11   evidence already described above, Defendants put Quinn's phone on airplane mode while Denise

12   was still missing, even though Quinn told VPD the kidnapper would be contacting him at that

13   number, and thus missed four communications from the kidnapper.  (Quinn Decl. ¶¶ 17-18.)

14   When Huskins was found alive, Defendants somehow concluded Huskins was not acting like

15   someone who had been assaulted, kidnapped, and drugged is "supposed to act" (O'Connell Decl.

16   ¶ 6), even though they had *never actually spoken with nor seen Huskins*.  (Huskins Decl. ¶ 18,

17   23.)  VPD also ignored the fact that Huskins and Quinn's stories completely corroborated one

18   another's.  (*See* Huskins Decl. ¶ 3; Quinn Decl. ¶ 3.)  Defendants further ignored the "darker

19   impression circles" under Denise's eyes found by HBPD (Clune Decl. Ex. A, p. 7; Huskins Decl.

20   ¶ 5), which was consistent with what she and Quinn had told the police about how they were

21   blindfolded (Huskins Decl. ¶¶ 3-5; Quinn Decl. ¶ 3.)  Instead, VPD ignored obvious and

22   available explanations to developments to credit their absurd, self-interested lies: for example

23   that because Denise was "wearing sunglasses" that therefore she must have faked the whole

24   thing.  (*See* Huskins Decl. ¶¶ 4, 8-9.)  In addition, rather than taking time to actually investigate

25   the crime, within hours of Denise being discovered alive, Detective Mustard insisted that he did

26   not believe the story about the "frog men" and immediately began attacking her.  (Nicholas

27   Huskins Decl. ¶ 14.)  This immediate and purposeful avoidance of the facts to fit a pre-

28   conceived—and entirely absurd—narrative alone is sufficient evidence from which a reasonable

1  juror could infer a deliberate decision not to acquire information about the kidnapping, and thus a

2  reckless disregard for the truth.[6]

3       Similarly demonstrating such reckless behavior is the completely unjustified inference

4  that, because Huskins's cousin was a lawyer, and that he was supporting her on the scene, that

5  Huskins had therefore "lawyered up" and must be guilty. This was her cousin—not a "retained

6  lawyer"—and Vallejo knew that. (Nicholas Huskins Decl. ¶¶ 21-22.) In addition, our entire

7  criminal justice system is predicated on the notion that people are not guilty just because they

8  want a lawyer. This presents a particularly egregious instance where such an inference is

9  unfounded. After all, throughout this period, Mustard had been telling Denise's confidants—

10  including her mother and her cousin—that Denise had been lying and would face criminal

11  prosecution. (*Id.* ¶ 14.) Thus, it obvious that she might seek legal help despite her innocence.

12       Finally, Defendants' declarations, if taken at face value, provide more than sufficient

13  evidence from which a reasonable juror could infer a reckless disregard for the truth. Mustard

14  admits he *actually possessed serious doubts* regarding the circumstances of Plaintiffs' assault

15  and kidnapping, but Defendants nevertheless went ahead with their press release. Mustard states

16  in his sworn declaration that "*I did not know what had happened*" and that he had "considered

17  multiple different theories that could have resulted in criminal charges being filed against various

18  persons, *had sufficient evidence been found*." (Mustard Decl. ¶¶ 16-17 (emphasis added).) A

19  reasonable juror could infer malice from these statements, though the full picture readily

20  supports an inference of deliberate knowledge of falsity here.[7]

21       Finally, as described in Plaintiffs' concurrently filed Rule 56(d) motion for discovery,

---

[6]   Defendants' declarations also make hay of the supposedly low ransom amounts requested by the kidnapper. But to get there, Defendants must intentionally ignore the emails Quinn *showed them* explaining that the ransom amount was designed to avoid triggering a $10,000 reporting limit regulation. (Quinn Decl. Ex. A.)

[7]   As Defendants acknowledge, Defendant City of Vallejo is vicariously liable for the conduct of its employees. *See* Cal. Gov't Code § 815.2. Thus, because Plaintiffs have adequately plead their defamation claim as against Mustard, Park, and the unknown Doe Defendants, Plaintiffs have successfully plead the defamation claim against the City of Vallejo.

1    because malice is a deeply rooted factual issue for which Plaintiffs are entitled to discovery

2    before their claims can be stricken, Plaintiffs should be allowed discovery on the issue of actual

3    malice before the Court could strike this defamation claim.

4          **B.      PLAINTIFF HUSKINS CAN ESTABLISH A PROBABILITY OF PREVAILING ON HER
                     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM**

5
6          Defendants challenge Huskins's IIED claim for the same reasons as the defamation

7    claim: California Civil Code section 47(b), California Government Code section 821.6, and the

8    *New York Times* standard.  Defendants do not challenge the IIED claim on other grounds.[8]  As

9    explained above, neither asserted privilege or immunity applies here.  The statements made to

10   the public lack the "functional connection" to judicial or official proceedings to be covered by

11   the litigation privilege.  *See Rothman*, 49 Cal. App. 4th at 1141.  Similarly, California

12   Government Code section 821.6 applies only to malicious prosecution claims and thus does not

13   immunize Plaintiffs' IIED claim.  *Garmon*, 2016 WL 3606745, at *7; *Williams*, 2013 WL

14   498854, at *17 ("section 821.6 does not automatically immunize Defendants' investigatory

15   conduct against Plaintiff's IIED claim").  Finally, Plaintiffs have established that they were not

16   public figures under the *New York Times* standard because they took no "voluntary act through

17   which [they] seek[] to influence the resolution of the public issues involved." *Reader's Digest

18   Assn.*, 37 Cal. 3d at 254.  Thus, Defendants' motion to strike the IIED claim fails for the same

19   reasons that the motion to strike the defamation claim does.

20   **V.    CONCLUSION**

21         For the aforementioned reasons, Plaintiffs respectfully request that the Court deny

22   Defendants' motion to strike.  To the extent the motion is granted in any respect, Plaintiffs

23   should be given leave to amend.

24

25

26

27   ────────────────────

28   [8]      Importantly, Defendants do not challenge Quinn's IIED claim based on his illegal 18-
         hour interrogation.  Thus, his IIED claim clearly remains regardless of Huskins's claim.

1    Date:  August 25, 2016              **KERR & WAGSTAFFE LLP**

2

3                                        By:  /s/ Kevin B. Clune
                                              KEVIN B. CLUNE

4
                                         Attorneys for Plaintiffs
5                                        DENISE HUSKINS and AARON QUINN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 2:16-cv-00603-TLN-EF              PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE