JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
KEVIN B. CLUNE (248681)
clune@kerrwagstaffe.com
KENNETH P. NABITY (287927)
nabity@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, CA 94105–1727
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Plaintiffs
DENISE HUSKINS and AARON QUINN

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DENISE HUSKINS and AARON QUINN, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF VALLEJO, a public entity, KENNY PARK, MATHEW MUSTARD, and DOES 1-25, <br><br> Defendants. | Case No. 2:16-cv-00603-TLN-EF <br><br> **DECLARATION OF DENISE HUSKINS IN SUPPORT OF OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE THE SECOND AND FIFTH CAUSES OF ACTION** <br><br> Date: September 8, 2016 <br> Time: 2:00 p.m. <br> Courtroom: 2, 15th Floor <br> Judge: Hon. Troy L. Nunley |

I, Denise Huskins, make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the facts set forth below.

1. I am a plaintiff in the above-captioned proceeding.

2. I am a licensed physical therapist with a Doctorate in Physical Therapy. In March 2015, I was living in Vallejo, California and was a resident in an international, post-graduate residency program for adult neurological rehabilitation at Kaiser Hospital. I have never held public office nor have I attempted to inject myself into any public controversy or issue of public concern, as I understand those terms.

3. On March 23, 2015, I was sleeping at Aaron Quinn's home, when one or more intruders broke into the home, blindfolded us, forced me to bind Aaron's hands and feet, bound my hands and feet, and drugged us. At the time of the incident, it appeared that there were multiple people involved and we were instructed that numerous people were involved. Although only one assailant (Matthew Muller) is currently being prosecuted for the crime, for ease of reference, I will simply reference the "intruder" or "assailant" (singular).

4. When initially taken from Aaron's house, I was driven in the trunk of Aaron's car to a location where I was placed into the trunk of a different car. I understood that the assailant brought my purse, bag, glasses, and backpack, which I had brought to spend the night at Aaron's.

5. I then was transported several hours away in the trunk of a car by the kidnapper. I was guided into the bedroom of a home, where I was at one point tied to the bed with zip ties and a bike lock. For the next day, I was forced to wear a blindfold made of blacked out swim goggles when the assailant entered the room. I was drugged repeatedly while held captive, and raped twice. I was told that both rapes were recorded on video to prevent me from speaking to the police about the rapes. I was initially told that these videos would be displayed on the internet unless I continued to cooperate.

6. While held captive, the assailant forced me to record a "proof of life" tape.

7. Following the second rape, the kidnapper told me that I would be released. The kidnapper threatened me again, telling me that when I spoke with the police or media, I should never speak of the rape or of the assailant's supposed military background, otherwise he would

harm me and/or my family and publish the videos of my rape. I was again drugged and blindfolded, and forced to hide in a car as the assailant drove for hours.

8. On March 25, 2015, after being kidnapped, assaulted, and detained for over two days, I was released near my parents' homes in Huntington Beach. The assailant dropped me in an alley and left my bags with me. At this point, I had been forced to wear tape over my eyes, with sunglasses hiding the tape to disguise that I was being held captive during the drive. I removed the tape from my eyes.

9. My prescription glasses were inside one of the bags left with me. Having been blindfolded for days at this point, I do not recall whether I continued to wear the sunglasses given to me by the assailant or switched to my prescription glasses. In any event, my prescription glasses at the time had thick frames and transitioned automatically to darker lenses in sunlight.

10. After I was unable to locate anyone at my mother's home, I walked to my father's home.

11. The Huntington Beach Police Department arrived at my father's home. There were more police officers than I could count.

12. I spoke with HBPD for over an hour and never refused to cooperate with HBPD. I told HBPD exactly what happened at Aaron's house and then while I was kidnapped.

13. In addition to the statements I provided, I showed HBPD the shoes the assailant gave me, which were too large for my feet, and the water bottle the kidnapper gave me.

14. Consistent with the assailants' threats, and in fear for my or my family's safety, I denied to HBPD that I had twice been sexually assaulted and did not mention that the kidnapper claimed to be ex-military.

15. The HBPD officer interviewing me told me that he needed to go speak with Vallejo Police Department ("VPD") and left for approximately one-half hour. I was asked to remain patient as it took time for HBPD to coordinate with VPD. I was also told that media had assembled outside, and could hear helicopters and other commotion.

16. I did not want anyone in the public to hear about my kidnapping and sexual

assault. In fact, I wanted the entire situation to be over and to move on as quickly as possible. Given the nature of the kidnapping, and what I had been told about the "organization" behind it, I was tremendously skeptical that my assailant or any conspirators would ever be caught, and was terrified that I would be assaulted again.

17. My cousin, Nick Huskins, and my aunt, Jody, arrived at my father's home to comfort me. I understood they were not allowed to speak with me for a significant portion of the time I spoke to HBPD.

18. I was told that VPD wanted to speak with me, and my cousin offered to take the calls for me.

19. I was told that Det. Mustard told my cousin that VPD was offering a "proffer of agreement" for leniency. Det. Mustard stated that Aaron had been at the station cooperating with VPD, and whoever accepted first would get immunity. My cousin told me that Det. Mustard said that he did not believe my story about the "frog men." My cousin told me that Det. Mustard was hostile and aggressive.

20. I also learned about VPD's prior assertions that Aaron murdered me and its new assertions that we had faked the entire story. I was afraid that VPD would unjustly paint me as a suspect in a crime rather than as the victim that I was. Rather than take VPD's jet, I took a commercial flight back to the Bay Area. I travelled alone with a borrowed cell phone, and returned to San Francisco at approximately 9:30 p.m., doing whatever I could to avoid the press, police, or still on the loose kidnapper, each of which I believed could be after me.

21. That night, I learned that VPD issued a press release to the public, stating in part: "Today, there is no evidence to support the claims that this was a stranger abduction or an abduction at all. Given the facts that have been presented thus far, this event appears to be an orchestrated event and not a kidnapping."

22. I also learned that VPD held a press conference accusing me of faking my own kidnapping.

23. At the time of the press release and press conference, I had not yet seen or spoken with anyone at VPD.

24. Following Lt. Park's press conference, news outlets across the world likened me to the lead character in the film "Gone Girl," and placed my picture next to that of the lead character, including one depicting the character naked and covered in blood. Nancy Grace took to television displaying the Twitter hashtag "#kidnappinghoax." My social media accounts were immediately flooded with innumerable vitriolic and violent statements directed at me, containing language and statements too vulgar to reproduce here.

25. Also on the night of March 25, I met with an attorney because VPD had threatened me with criminal prosecution. I heard my attorney tell VPD that I would continue to cooperate with the investigation into my kidnapping and that I wished to submit to a sexual assault exam as soon as possible. I heard VPD demean the exam request and responded that the sexual assault exam could wait, implying that I was also lying about that.

26. As I understood, VPD was publicly and privately implying that I had lied about being sexually assaulted. I submitted to an hours-long SART exam, but have never been provided the results of that exam nor will anyone tell me where I can find the results or if the exam kit even exists anymore.

27. I spoke with VPD for nearly two full days about the captivity and sexual assaults. Investigators repeatedly told me and my attorneys that I was lying.

28. Following my lengthy interrogations, and due to the ongoing and aggressive harassment by VPD, and those connected to us, I no longer feel safe in the City of Vallejo. VPD's actions have forced me to leave the City of Vallejo.

29. On July 20, 2015, the City of Vallejo sent me a letter stating that "it is clear now that there was a kidnapping on March 23, 2015, that it was not a hoax or orchestrated event and that VPD conclusions were incorrect." But even then, VPD still maintained that it had done nothing wrong given "the information that was available at the time." A true and correct copy of the City of Vallejo's letter to me is attached hereto as Exhibit A.

30. In the meantime, my life has been destroyed. I lost out on a prestigious fellowship, and was out of work for over a year. I have suffered from depression, anxiety, general distrust of everyone, and paranoia.

1   I declare under penalty of perjury under the laws of the United States that the foregoing is
2  true and correct.

4   Executed on August 25, 2016

_____
DENISE HUSKINS

# EXHIBIT A



# CITY OF VALLEJO
OFFICE OF THE CHIEF OF POLICE

111 AMADOR STREET • VALLEJO • CALIFORNIA • 94590-6301 • (707) 648-4540 • FAX (707) 648-4390

July 20, 2015

Ms. Denise Huskins
c/o Mr. Doug Rappaport
Law Office of Douglas Rappaport
260 California Street, Suite 1002
San Francisco, CA  94111

Dear Ms. Huskins:

We apologize for and regret comments made by representatives of the Vallejo Police Department (VPD) during the initial kidnapping investigation. We understand that these contributed to the difficulty and personal ordeal that you have experienced. While these comments were based on our findings at the time, they proved to be unnecessarily harsh and offensive.

In light of new evidence cited in the recently unsealed federal complaint, dated June 29, 2015, and not available to the VPD or the FBI at the time of the kidnapping, it is now clear that there was a kidnapping on March 23, 2015, that it was not a hoax or orchestrated event and that VPD conclusions were incorrect.

As you know, the VPD and the FBI were jointly investigating this incident from the onset. While we believe our officers took appropriate investigative steps with the information that was available at the time of the abduction, subsequent events and the continued joint FBI and VPD investigation of those events led to the conclusion that an abduction had indeed occurred.

The VPD continues to work closely with the FBI and federal prosecutors to ensure that justice is achieved. To this end, VPD will not be making any public comments so as not to impede, sidetrack, or divert attention or resources from the current investigation.

It is our hope and expectation that an indictment will be forthcoming against Matthew Muller. At that time, the VPD will make our apology to you public.

Sincerely,

ANDREW J. BIDOU
Chief of Police

Printed on ♻ Recycled Paper