JAMES M. WAGSTAFFE (95535)
wagstaffe@kerrwagstaffe.com
KEVIN B. CLUNE (248681)
clune@kerrwagstaffe.com
KENNETH P. NABITY (287927)
nabity@kerrwagstaffe.com
**KERR & WAGSTAFFE LLP**
101 Mission Street, 18th Floor
San Francisco, CA 94105–1727
Telephone: (415) 371-8500
Fax: (415) 371-0500

Attorneys for Plaintiffs
DENISE HUSKINS and AARON QUINN

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE HUSKINS and AARON QUINN, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF VALLEJO, a public entity, KENNY PARK, MATHEW MUSTARD, and DOES 1-25, <br><br> Defendants. | Case No. 2:16-cv-00603-TLN-EF <br><br> **DECLARATION OF AARON QUINN IN SUPPORT OF OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE THE SECOND AND FIFTH CAUSES OF ACTION** <br><br> Date: September 8, 2016 <br> Time: 2:00 p.m. <br> Courtroom: 2, 15th Floor <br> Judge: Hon. Troy L. Nunley |

I, Aaron Quinn, make this declaration of my own personal knowledge, and, if called as a witness, I could and would testify competently to the facts set forth below.

1. I am a plaintiff in the above-captioned proceeding.

2. I am a licensed physical therapist with a Doctorate in Physical Therapy. In March 2015, I was living in Vallejo, California and was at the neurological rehabilitation center at Kaiser Hospital. I have never held public office nor have I attempted to inject myself into any public controversy or issue of public concern, as I understand those terms.

3. On March 23, 2015, Denise Huskins and I were sleeping at my home, when one or more intruders broke into the home, blindfolded us, bound our hands and feet, and drugged us. At the time of the incident, it appeared that there were multiple people involved and we were instructed that numerous people were involved. Although only one assailant (Matthew Muller) is currently being prosecuted for the crime, for ease of reference, I will simply reference the "intruder" or "assailant" (singular).

4. The assailant instructed me that Denise would be kidnapped for ransom, that I would be monitored, and that the assailant would harm Denise and my family if I went to the police. I was told to monitor my cell phone and email for updates.

5. Having been given a strong sedative, I succumbed to sleep from the effects of the sedative and awoke several hours later. When I woke up, I exchanged a number of texts and emails with the person I understood had Denise, and that person was demanding a ransom for her release.

6. After agonizing about what to do, I called the Vallejo Police Department to seek their help ("VPD").

7. VPD came to my home. The police immediately acted as if I was the criminal rather than the victim, focused solely on irrelevant evidence they thought might implicate me, such as whether I had held a party the night before. Among other evidence, I allowed VPD full

access to find signs of forced entry to the house, showed them the batteries and other items left by the kidnapper, and showed them the emails I received from the kidnapper. True and correct screenshots of emails I had exchanged with the person I understood was holding Denise are attached to this declaration as Exhibit A. I then went with officers to the VPD station at 3:30 p.m., where I was treated like I had already been convicted of murdering Denise.

8.   I gave VPD my clothing to check them for evidence. In exchange, I was given prison pants with the words "Solano Prison" displayed on the side and a dirty white t-shirt, but no underwear or socks. I also consented to a blood and DNA test to determine what had been used to drug us. The police placed me in a small interrogation room without a clock, where I was cut off from any family or other visitors who would be able to help me.

9.   VPD proceeded to interrogate me aggressively for approximately 18 hours. Det. Mustard and others repeatedly told me they believed I was lying, that they did not want to hear anything else about any claimed intruders, and that they knew that I had really killed Denise. I was told I would be branded a "cold, calculated monster," asked me whether I had ever seen a body after it had been exposed to the elements, and told me that I was going to ruin my family's name. Det. Mustard told me that the kidnappers had not tried to communicate at all with me since I had arrived at the VPD station.

10.   VPD (including but not limited to Det. Mustard) led me to believe that I was not free to leave during the marathon interrogation. For example, a sign on the inside of the door read "[t]his door is to remain closed at all times." During the interrogation, they locked the door. When I had to use the bathroom, officers accompanied me. Also during the interrogation, officers positioned themselves between me and the doorway—physically blocking my ability to leave—and screamed at me and invaded my personal space.

11.   During the eighteen-hour interrogation, I was given only two bottles of water, a travel-size bag of chips, and a slice of cold pizza. During breaks, I was left in the room alone,

and would curl into a ball in one of the rolling swivel chairs to cry or pass out from sheer exhaustion.

12. VPD also kept me incommunicado from my relatives, despite my requests to see my relatives. VPD did not tell me that my family was there for me (which I learned after the fact that they were).

13. Over twelve hours after the interrogation began—and approximately 24 hours after I had first been drugged and assaulted by the kidnapper—the investigating officers subjected me to a lie detector test. I answered truthfully. I was told that I had failed the test, and VPD continued to interrogate me even more aggressively.

14. After repeated accusations that I killed Denise, I realized that my cooperation was not helping and I asked to speak to an attorney. At 6:00 a.m., I was able to speak with my brother. My brother left the station to help me find an attorney, who arraived by 9:00 a.m.

15. I was released after my attorney arrived.

16. When VPD finally allowed me to leave, they told me—sleep deprived, hungry, and still wearing the jail clothes from VPD—to exit the front of the station where numerous media outlets had congregated. My attorneys secured a more discrete release.

17. Following my release, I learned that VPD ignored key evidence that would have both corroborated my account and could have kept Denise from further harm. I had told the officers that the kidnapper had been communicating with me via my email account and cell phone, and gave VPD access and passwords to my email accounts and cell phone. During the interrogation, VPD kept my cell phone and I was unable to access my email.

18. When I returned to the VPD station on March 24 to continue to answering questions, investigators showed me my cell phone and asked if I recognized certain numbers. At that time, my attorney's assistant recognized that the phone had been placed on "airplane" mode. Once we released this, a flood of new messages and phone calls were revealed. As I told the

officers was likely to occur, the kidnapper had reached out both by email and phone. At 7:46 p.m. and 8:13 p.m., while I had been detained the night before, the kidnapper sent emails to me stating that he would call me on his mobile device "at about 9pm." True and correct copies of screenshots of those emails are attached to this declaration as Exhibit B. There were a number of missed calls around that time that had gone unanswered.

19. Despite VPD's accusations and threats, I fully cooperated with VPD, hoping to get Denise back safely. I answered as many questions that they asked. My attorney asked what other information they needed, and VPD could not come up with any information that they believed I had that I had not already disclosed.

20. On March 25, 2015, I learned that Denise was released near her parents' homes in Huntington Beach. My first response was tremendous relief. I had been terrified that Denise would be harmed, and, even worse, that she might have been killed because I went to the police.

21. When I spoke with VPD after Denise's release, Det. Mustard told me that he did not believe either of us, and encouraged me to make a deal with them before Denise did. By that point, I had provided three separate, complete statements and underwent a polygraph test. I had provided access to my home, my clothes, my emails, my phone, and even my body through blood and DNA testing, yet somehow Det. Mustard immediately transitioned from calling me a murderer to calling me a hoaxer.

22. Before I ever saw or spoke to Denise, and before she had even returned to the Bay Area, VPD issued a press release to the public, stating in part: "Today, there is no evidence to support the claims that this was a stranger abduction or an abduction at all. Given the facts that have been presented thus far, this event appears to be an orchestrated event and not a kidnapping."

23. I also saw the press conference, during which Lt. Park claimed Denise and I

plundered resources from our community and faked the kidnapping. Lt. Park announced that we caused a "wild goose chase" and "owe[] this community an apology," but refused to go into any details about what led to such a conclusion.

24. Following Lt. Park's press conference, I saw reports from outlets across the world that likened Denise to the lead character in the film "Gone Girl," and placed her picture next to that of the lead character, including one depicting the character naked and covered in blood. Nancy Grace took to television displaying the Twitter hashtag "#kidnappinghoax."

25. Due to the ongoing and aggressive harassment of me, Denise, and those connected to us, I no longer feel safe in the City of Vallejo. I have since left the City of Vallejo.

26. In June 2015, I learned that Matthew Muller was arrested in connection with a similar invasion and assault.

27. On July 20, 2015, the City of Vallejo sent me a letter stating that "it is clear now that there was a kidnapping on March 23, 2015, that it was not a hoax or orchestrated event and that VPD conclusions were incorrect." But even then, VPD still maintained that it had done nothing wrong given "the information that was available at the time." A true and correct copy of the City of Vallejo's letter to me is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on August 25 2016



AARON QUINN



# EXHIBIT A

**From: AARON** >                                    Hide

To: Aaron >

**Re:**

March 23, 2015 at 12:52 PM
Inbox

Please contact Chase and find out whether it is possible. If asked, state that the money is for a used ski boat. We will follow up in 30 minutes

**From:** "Aaron" 
**To:** "AARON" <
**Sent:** Monday, March 23, 2015 7:50:51 PM
**Subject:** Re:

I do not know how to get a cash advance from my card. The amount is acceptable but I need instructions on how to get the money necessary.

Sent from my iPhone

On Mar 23, 2015, at 12:46 PM, "AARON" <                    > wrote:

    



❮ Thread                    **4 of 4**                    

To: Aaron ❯

**Re:**
March 23, 2015 at 12:46 PM
Inbox

We will proceed with this address.

Denise is well.  We have a short recorded message so stating that I will format and send at some point.

Are you able to obtain a cash advance from your bank card?  If so, cash in the amount of $8500 from one account and cash in the amount of $8500 from the othe account would settle this matter.  For your own safety, we do not wish to trigger the $10000 reporting limit or other structured transactions regulations.  You would be welcome to transfer what money you like back to the credit card.

The drop would happen tomorrow night or early Wednesday morning, with release to follow quickly provided all instrutions are followed.

Is this acceptable?

    

from one account and cash in the amount of $8500 from the othe account would settle this matter.  For your own safety, we do not wish to trigger the $10000 reporting limit or other structured transactions regulations.  You would be welcome to transfer what money you like back to the credit card.

The drop would happen tomorrow night or early Wednesday morning, with release to follow quickly provided all instrutions are followed.

Is this acceptable?

-L

---

**From:** "Aaron" <██████████████>
**To:** "aaron quinn" <██████████████>
**Sent:** Monday, March 23, 2015 7:42:03 PM

I replied via text message and I sent email to aqaropkirklandvallejo@hotmail.com

Sent from my iPhone

**From: AARON**  Hide

To: Aaron

**No Subject**
March 23, 2015 at 3:39 PM

We are considering how to proceed. In any event you will be visiting the bank(s) in the morning. Please hold fast for tonight. Denise is doing well.

# EXHIBIT B

**From: AARON** >                                    Hide

**To:** Aaron >  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >

**Re:**
March 23, 2015 at 8:13 PM
Inbox

We are waiting on your acknowledgment

**From:** "AARON" <▮▮▮▮▮▮▮▮▮▮▮▮>
**To:** "Aaron" <▮▮▮▮▮▮▮▮▮▮▮▮>,
▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Tuesday, March 24, 2015 2:46:39 AM

We will call you at about 9pm on your mobile phone. You liaison will be the same contact as during the aquisition phase. Please verify that you have received this message.

# EXHIBIT C



# CITY OF VALLEJO
OFFICE OF THE CHIEF OF POLICE

111 AMADOR STREET   •   VALLEJO   •   CALIFORNIA   •   94590-6301   •   (707) 648-4540   •   FAX (707) 648-4390

July 20, 2015

Mr. Aaron Quinn
c/o Mr. Dan Russo
Morton & Russo LLP
521 Georgia Street
Vallejo, CA 94590

Dear Mr. Quinn:

We apologize for and regret comments made by representatives of the Vallejo Police Department (VPD) during the initial kidnapping investigation. We understand that these contributed to the difficulty and personal ordeal that you have experienced. While these comments were based on our findings at the time, they proved to be unnecessarily harsh and offensive.

In light of new evidence cited in the recently unsealed federal complaint, dated June 29, 2015, and not available to the VPD or the FBI at the time of the kidnapping, it is now clear that there was a kidnapping on March 23, 2015, that it was not a hoax or orchestrated event and that VPD conclusions were incorrect.

As you know, the VPD and the FBI were jointly investigating this incident from the onset. While we believe our officers took appropriate investigative steps with the information that was available at the time of the abduction, subsequent events and the continued joint FBI and VPD investigation of those events led to the conclusion that an abduction had indeed occurred.

The VPD continues to work closely with the FBI and federal prosecutors to ensure that justice is achieved. To this end, VPD will not be making any public comments so as not to impede, sidetrack, or divert attention or resources from the current investigation.

It is our hope and expectation that an indictment will be forthcoming against Matthew Muller. At that time, the VPD will make our apology to you public.

Sincerely,

ANDREW J. BIDOU
Chief of Police